Michael and Cynthia PRIDE, minors, by
their mother and next friend Bulena
Pride, et al., Plaintiffs-Appellants,

v.

The COMMUNITY SCHOOL BOARD OF
BROOKLYN, NEW YORK SCHOOL
DISTRICT #18, a body corporate, et
al., Defendants-Appellees.

No. 293, Docket 73-2223.

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1973.

Decided Nov. 21, 1973.

322

Doron Gopstein, New York City (Norman Redlich, Corp. Counsel of the City of New York, and Michael B. Rosen,

Brooklyn, N. Y., on the brief), for defendants-appellees.

James I. Meyerson, N.A.A.C.P., New York City (Nathaniel R. Jones, N.A.A.C.P., New York City, I. Frederick Shotkin and Delson & Gordon, New York City, on the brief), for plaintiffs-appellants.

Before HAYS, FEINBERG and TIMBERS, Circuit Judges.

HAYS, Circuit Judge:

This is our second encounter with the dispute concerning the placement in New York City public schools of children from the Tilden Houses of Brooklyn.[1] In this phase of the litigation plaintiffs moved for a preliminary injunction against an order by the City Board of Education assigning Tilden House children first entering public school to districts other than District 18. The United States District Court for the Eastern District of New York denied the motion. The court found that plaintiffs had failed to show probability of success and irreparable harm or that the balance of hardships weighed decidedly in their favor. We affirm.

I. THE FACTS

The Tilden Houses are located in the predominantly black and Puerto Rican section of Brooklyn known as Brownsville. To the south and southeast of Brownsville lie the racially mixed neighborhood of East Flatbush and the predominantly white neighborhood of Canarsie. In 1962 the Board of Education, in an effort to promote integration, rezoned the Tilden House children from the neighborhood Brownsville schools, which subsequently became part of District 23, into schools in East Flatbush, which has become part of District 18.

In 1970 much of the authority for governing the elementary and junior high schools of New York City was

1. In an earlier phase of this case plaintiffs were denied a preliminary injunction against a plan to reassign Tilden House children from one elementary school in District 18 to another in the same district. Pride v. Community School Board of Brooklyn, New York School District # 18, 482 F.2d 257 (2d Cir. 1973).

transferred from the City Board of Education to Community District School Boards pursuant to New York's School Decentralization Law (New York Education Law, Article 52–A, § 2590 et seq. [McKinney's 1970 Consol.Laws, c. 820]).

In May, 1971 the Community School Boards of Districts 18 and 23 entered into an agreement whereby Tilden House children would be zoned into their neighborhood schools in District 23 for the school year beginning September 1971. School Chancellor Scribner rejected this agreement, and the City Board of Education and the Commissioner of Education sustained the Chancellor's decision.

Further difficulties developed when the District 18 Community Board refused to assign Tilden House children to Junior High School 285, the junior high school in District 18 which Tilden House children had previously attended. Chancellor Scribner again reversed the Community Board and ordered it "to assign the Tilden Housing children at the junior high school level either to J–285 . . . and/or to other schools in your district where integrated education would be possible." The Community Board refused to follow this directive, and Chancellor Scribner superseded the Community Board and ordered that the Tilden House children be given the option of attending Junior High Schools 285, 211 or 68, all within District 18. He also ordered the Community Board to devise a plan designed " . . . more nearly to equalize integration in these schools starting with the 1973–74 school year."

In January, 1973 the Community Board presented its plan. At this time the ethnic compositions of the three junior high schools were as follows:

| School | Others (white) | Black and Puerto Rican |
|---|---|---|
| J.H.S. 68 | 98% | 2% |
| J.H.S. 211 | 66% | 34% |
| J.H.S. 285 | 42% | 58% |

The three schools are in the Canarsie section of District 18. JHS 285 is closest to East Flatbush, while JHS 68 is furthest from East Flatbush and Brownsville. The Community Board projected the following figures for 1975 if the existing zoning continued:

| School | Others (white) | Black and Puerto Rican |
|---|---|---|
| J.H.S. 68 | 85% | 15% |
| J.H.S. 211 | 70% | 30% |
| J.H.S. 285 | 50% | 50% |

The Community Board's plan provided for zoning the Tilden House children into other districts, though it did not indicate which districts.

In January, 1973 Chancellor Scribner accepted the Community Board's plan with an amendment providing that the Tilden House children would continue to attend junior high schools in District 18, subject to future review in light of changing population patterns.

The Community Board appealed the decision of the Chancellor to the City Board of Education. The City Board conducted hearings and on March 30, 1973 issued its decision holding that neither the Community Board's plan nor the Chancellor's plan fully considered that:

"[m]assive ethnic changes are taking place in many of the elementary schools, particularly those into which the Tilden House pupils are zoned. It is clear that the residential changes in these school zones have resulted in the 'other' enrollment becoming the minority. Obviously the changes at the elementary school level have major impact on the junior high schools which are the subject of this appeal.

"This Board finds that neither the plan presented by Community School Board 18 nor the . . . modification of this plan by the Chancellor fully takes these changes into account. The policy of this Board is and continues to be to encourage quality integrated education to the extent feasible.

"The use of children as pawns in boycots and other pressure tactics is demagogic and irresponsible and can

have no influence whatever on the decision of the Board of Education. On the other hand, the Board feels that it would be just as irresponsible and demagogic to continue to send out of district minority group youngsters indefinitely into schools with rapidly growing minority registers under the guise of promoting quality integrated education."

The City Board ordered that:

"commencing in September 1973 Tilden House children newly entering the first grade who would have entered District 18 schools are to be zoned and permitted options to attend schools in other districts. . . ."[2]

Acting Chancellor Irving Anker later implemented the order by directing that newly entering Tilden House children be zoned into Districts 20, 21 and 22, with parents of each child to select among the designated schools within such districts.

The racial mix and utilization levels of the schools in Districts 18, 20, 21 and 22 are as follows:

| Elementary | Black | Puerto Rican | Other (White) | Utilization |
|---|---|---|---|---|
| District 20 | 9% | 11% | 78% | 73% |
| District 21 | 16% | 11% | 72% | 73% |
| District 22 | 16% | 3% | 80% | 78% |
| District 18 | 35% | 6% | 58% | 89% |

| Junior High School | Black | Puerto Rican | Other (White) | Utilization |
|---|---|---|---|---|
| District 20 | 14% | 13% | 72% | 100% |
| District 21 | 16% | 9% | 74% | 87% |
| District 22 | 15% | 1% | 82% | 101% |
| District 18 | 47% | 7% | 45% | 105% |

In May, 1973 the Chancellor submitted a list of "designated" schools within Districts 20, 21 and 22 which the Tilden House children were eligible to attend. Of the 37 designated schools all have an "other" enrollment of over 60%, 36 have an "other" enrollment of over 80%, and 12 have an "other" enrollment of over 90%. The five elementary schools in District 18 which the Tilden House children had attended prior to the March 30

order had shown the following ethnic compositions:

| | Black | Puerto Rican | Other |
|---|---|---|---|
| PS 135 | 57.9% | 11.4% | 30.7% |
| PS 244 | 49.9 | 11.4 | 38.7 |
| PS 235 | 57.7 | 11.2 | 31.1 |
| PS 233 | 53.2 | 12.1 | 34.7 |
| PS 268 | 73.6 | 7.8 | 18.6 |

Within District 18 seven elementary schools had "other" enrollments over 60%; in three of these the "other" enrollment was over 90%.

## II. THE PRELIMINARY INJUNCTION STANDARD

In our earlier opinion in this case [*Pride I*] this court stated as follows the standard by which the district court must be guided in deciding upon a motion for a preliminary injunction:

"We repeatedly have emphasized the heavy burden on a party seeking the extraordinary remedy of preliminary injunctive relief. The standard that has evolved is that the moving party 'assume[s] the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury *or* that [it has] raised serious questions going to the merits and that the balance of hardships [tips] sharply in [its] favor.' Stark v. New York Stock Exchange, 466 F.2d 743, 744 (2 Cir. 1972) (emphasis added); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2 Cir.), cert. denied, 394 U.S. 999 [,89 S.Ct. 1595, 22 L.Ed.2d 777] (1969). We find that standard to be particularly appropriate here where there is a strong public interest in the outcome of the dispute. See, e. g., Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687, 692–693, 698–699 (2 Cir. 1973); Exxon Corp. v. City of New York, 480 F.2d 460 (2 Cir. 1973).

"With this standard in mind, we turn to an examination of the evidence adduced at the hearing below,

2. The March 30 plan required assignment of Tilden House children entering the 7th grade

to Junior High School 68. Plaintiffs do not challenge this part of the plan.

recognizing that in reviewing the denial of a motion for a preliminary injunction our role is limited. 'A clear abuse of discretion . . . must be shown to an appellate court in order to obtain a reversal of the trial court's denial of temporary injunctive relief.' Checker Motors Corp. v. Chrysler Corp., *supra*, 405 F.2d at 323; Dino de Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 374–375 (2 Cir. 1966)."

482 F.2d at 264 (footnote omitted).

## III. PROBABILITY OF SUCCESS

The district court considered both the intent and the effect of the March 30 plan of the City Board and found it not discriminatory in either respect. We agree.

### (A) *Discriminatory Intent*

■ Absence of a discriminatory intent does not necessarily bar a successful equal protection action. Wright v. Council of the City of Emporia, 407 U.S. 451, 461–462, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); Chance v. Board of Examiners, 458 F.2d 1167, 1175–1176 (2d Cir. 1972). On the other hand proof of discriminatory intent does not by itself render an act violative of equal protection. Palmer v. Thompson, 403 U.S. 217, 224–225, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971). This court recognized the limited significance of intent or motive in its earlier opinion in this case. *Pride I*, 482 F.2d at 265–267. But a discriminatory motive "may add to the discriminatory effect of the action by intensifying the stigma of implied racial inferiority." Wright v. Council of the City of Emporia, 407 U.S. at 461, 92 S.Ct. at 2203. Where a discriminatory intent exists a court may scrutinize more carefully the proffered justification for the allegedly discriminatory act. *Id.*; *cf.* Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Moreover, the motivation for a particular act may be part of the "historical context" within which we must examine the act itself. Reitman v.

Mulkey, 387 U.S. 369, 373, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). Thus the district court acted properly in receiving evidence on discriminatory intent without considering the issue controlling.

■ Appellants have emphasized here and in the court below that the City Board reviewed the decision of the Chancellor while under intense pressure from the Community Board of District 18 and from the white residents of Canarsie. They claim this demonstrates that the City Board capitulated to this pressure in reversing the Chancellor and that the March 30 order therefore resulted from an intent to discriminate. The plaintiffs' evidence on this point consists primarily of a showing that the members of the City Board were aware of the racial animosity in District 18. Rarely can a plaintiff expect to find more direct evidence in a case like this: even if the Board members were infected by prejudice they would hardly be inclined to announce the fact publicly. We are bound to view the act in light of its "historical context." Reitman v. Mulkey, supra. But the awareness of the Board members of conditions in District 18 and their subsequent decision to zone the Tilden House children out of District 18 do not by themselves conclusively prove discriminatory intent. Other reasons, non-discriminatory in nature, could have persuaded the Board. Defendants introduced evidence, including the testimony of Board President Joseph Monserrat and the March 30 statement by the Board (see page 429, supra), that racial animosity did not sway the Board's decision.

■ The district court faced an issue of fact. It resolved the issue by finding that the City Board "was unaffected by the local racial prejudice of the residents of District 18," that the plaintiffs had failed to show intent to segregate, and indeed that the plan showed affirmatively an intent to integrate and that the object of the plan was

"to slow down or reverse the history of the increase of blacks and minority

groups in the schools located in the East Flatbush section of District 18 for the purpose of establishing a stable racial mix in said schools."

In light of the heavy burden of proof borne by a party seeking a preliminary injunction and of the fact that the district court's conclusions of fact depended in large part on the evaluation of the credibility of viva voce testimony, we cannot say that these conclusions were clearly erroneous. F.R.Civ.P. 52(a).

### (B) *Discriminatory Effect*

■ As indicated above, the finding of an absence of discriminatory intent is not fatal to plaintiffs' action. Plaintiffs can still prevail if they can show that the March 30 order had the effect of discriminating against them in violation of the equal protection clause. In this case, however, the relevant facts showed no discriminatory effect.

A comparison of the ethnic compositions of District 18 and Districts 20, 21 and 22, see tables supra, shows that the former has a lower percentage of white students. In particular, the East Flatbush schools which the Tilden House children previously attended have a much lower proportion of white enrollment than Districts 20, 21 and 22. Moreover, at the time the City Board acted the East Flatbush schools were rapidly becoming more extensively segregated. Thus, in numerical terms the March 30 plan offered the Tilden House children schooling in a more integrated setting.

Numbers alone do not determine whether an act violates equal protection. In *Pride I* this court considered an act reassigning several Tilden House children from a school with an "other" enrollment of 46% to one with an "other" enrollment of 36%. We upheld the plan on the ground that the Community Board had acted to balance the sizes of first grade classes and that the plan effectuated the objective because the transferee school was less utilized than the transferor school. *Pride I* 482 F.2d

at 267–269. In the instant case Districts 20, 21 and 22 are less utilized than District 18. See tables supra. This would seem to confirm that the opportunities of the Tilden House children for quality integrated education will not deteriorate, and may improve, under the March 30 plan.

Based on these facts the district court found the March 30 plan to be an "integrative procedure." We agree. Factors other than ethnic composition and utilization may be significant in determining whether a school assignment plan is discriminatory. But plaintiffs in this action offered no evidence either to rebut the facts referred to above or to show that for any other reason the schooling in Districts 20, 21 and 22 would be any worse than in District 18. We can therefore find no discriminatory effect in the March 30 plan.

### (C) *The Legal Test Applied by the District Court*

■ Notwithstanding the conclusion that the March 30 plan is intended to improve integration, appellants insist that we reverse because the district court failed to subject the plan to the "compelling necessity" test. Noting that the Board's plan assigns the Tilden House children to schools on the basis of race, appellants seek to invoke the authority of the cases subjecting state action based on race to the compelling necessity test. They argue further, citing the opinion of the three-judge district court in Lee v. Nyquist, 318 F.Supp. 710, 719–720 (W.D.N.Y.1970), aff'd, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971) (mem.), that the plan must fall because defendants have failed to demonstrate that the professed objectives of the plan cannot be accomplished by alternative means which appellants find preferable.

First, appellants misconstrue the function of the compelling necessity test. Cases applying that standard invariably involve state action having a segregatory or discriminatory effect. No court has applied the test where state action

has had the effect and objective of reducing discrimination and segregation. See Porcelli v. Titus, 302 F.Supp. 726 (D.N.J.1969), aff'd, 431 F.2d 1254 (3d Cir. 1970); Offermann v. Nitkowski, 378 F.2d 22 (2d Cir. 1967); Deal v. Cincinnati Board of Education, 369 F.2d 55, 61 (6th Cir. 1966), cert. denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967); Springfield School Committee v. Barksdale, 348 F.2d 261, 266 (1st Cir. 1965); cf. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).[3]

■ Appellants misconstrue Lee v. Nyquist, 318 F.Supp. 710 (W.D.N.Y. 1970), and the significance of alternatives in equal protection cases. In *Lee* the court considered a statute which prohibited an appointed (as opposed to an elected) board of education from carrying out any plan of school integration. The court found that this served to continue segregation by making it more difficult to deal with racial imbalance. 318 F.Supp. at 716–720. Defendants there argued that the object and effect of the statute would be to promote the community acceptance necessary for the effectuation of local school desegregation. The Court responded:

> "In any event, the defendants have failed to show that the purpose they impute to the statute could not be accomplished by alternative methods, not

involving racial distinctions. See Hunter v. Erickson, supra, 393 U.S. [385,] at 392, 89 S.Ct. 557 [, 21 L.Ed. 2d 616]." 318 F.Supp. at 720.

In both *Lee* and *Hunter* the consideration of alternatives followed a finding that the state action in question had a discriminatory effect. In the instant case the March 30 plan has been found to have an integrative effect. No court has required a party to show the absence of preferable alternatives in such a case. School boards possess wide discretion in all aspects of school administration. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Pride I*, 482 F.2d at 268–269; Deal v. Cincinnati Board of Education, 369 F.2d 55, 61 (6th Cir. 1966). This discretion may not be exercised to transgress constitutional limitations. But where this discretion is exercised within constitutional limits we have no power to substitute for it our own preferences or those of appellants.[4]

## IV. IRREPARABLE HARM

■ The district court held that "[p]laintiff has failed to show . . . that irreparable harm will accrue through denial of this motion." Appellants contend that this finding is clearly erroneous. They do not contend that Districts 20, 21 and 22 are segregated or

---

3. Our recent decision in Otero v. New York City Housing Authority, 484 F.2d 1122 (1973), does not help appellants. In *Otero* the defendant refused to apply to blacks and Puerto Ricans its own regulation requiring it to offer new public housing first to original residents who had been displaced from the site during construction. The Authority sought to justify this discrimination on the ground that the new housing in question was located in a neighborhood which had experienced a steady decline in percentage of white residents and that it had an affirmative duty to prevent the neighborhood from becoming segregated. We accepted the validity of this justification in theory but remanded to the district court for a determination of whether such action was in fact necessary to maintain an integrated neighborhood. 484 F.2d at 1135. We declared further that the evidence

must be "convincing" and that the Authority's burden is a "heavy one." Id.

Appellants argue that the same standards must apply here, but the two cases are very different. Although integration was the object of the action in *Otero*, the method by which it was achieved was outright denial of new public housing to non-white persons on account of race. The dangers inherent in such action clearly justify the "heavy" burden. In the instant case, however, plaintiffs continue to receive an education at least as good as and more integrated than they had previously received. Under such circumstances no danger of discrimination is present.

4. Appellants have contended that the Tilden House children could also receive a quality integrated education by further integrating the schools within District 18.

that the quality of education there is in any way inferior to that in District 18. But they argue that the Tilden House children will see that their parents have lost a struggle involving intense racial animosities to keep them in District 18 and that this will generate feelings of inferiority. They invoke the holding in Brown v. Board of Education, 347 U.S. 483, 494, 74 S.Ct. 686, 98 L.Ed. 873 (1954), that to separate black children solely on the basis of race may cause them irreparable harm.

In *Pride I* we recognized "the anguish and frustrations that have been present throughout this controversy," 482 F.2d at 269, but still found no irreparable harm. Although the facts of this case are different, the distinctions observed in *Pride I* between that case and *Brown* apply equally in this case: the March 30 plan does not create or maintain school segregation and the academic quality of Districts 20, 21 and 22 is comparable to or better than that of District 18. We note also that Tilden House children who have attended District 18 schools will continue there under the March 30 plan, with only children newly enrolled to be affected. Thus we face here no dislocation from students having to switch schools. See *Pride I,* 482 F.2d at 269. With respect to these factors plaintiffs suffer no irreparable harm.

As to the emotional effect on the Tilden House children of reassignment in the wake of the District 18 dispute the lower court faced an issue of fact. Especially in light of the heavy burden borne by appellants in seeking a preliminary injunction we cannot say that the finding of no irreparable harm was clearly erroneous.

## V. BALANCE OF HARDSHIPS

 The same factors which persuaded us in *Pride I* that the balance of hardships did not tip sharply in favor of appellants dictate a similar finding in this case. *Pride I,* 482 F.2d at 269. As in *Pride I,* many of the factors to be considered are the same as were considered with respect to irreparable harm. Although granting a temporary injunction might not impose great hardship on defendants, neither does denial of the injunction create any hardship for plaintiffs. As stated in *Pride I*:

"'[t]he children have not been wrenched from a school earlier attended by them. A temporary injunction would not restore them to "status quo." It is a fair inference that their education will not be advanced by a mid-semester transfer to a different class conducted by a different teacher in a different school.' And that is reinforced by the passage of time since the district court's decision." 482 F.2d at 270–271.

Plaintiffs have failed to show a probability of success on the merits at trial. They have also failed to show that they will suffer irreparable harm from denial of the preliminary injunction or that the balance of hardships weighs decidedly in their favor. Therefore, we hold that the district court properly declined to grant a preliminary injunction.

Affirmed.