Edolphus TOWNS et al., Plaintiffs,

v.

Abraham D. BEAME, Individually and as
Mayor of the City of New York,
et al., Defendants.

No. 74 Civ. 5411 (JMC).

United States District Court,
S. D. New York.

Dec. 13, 1974.

Friedmann, Fischman & Chikofsky, New York City (William D. Friedmann, New York City, George J. Regan, Whitestone, N. Y., Leonard M. Weil, New York City, and Gerald Abrams, Flushing, N. Y., of counsel), for plaintiffs.

Adrian P. Burke, Corp. Counsel of City of New York (James G. Greilsheimer, Litigating Asst. Corp. Counsel, of counsel), for defendants Beame and O'Hagan.

Louis J. Lefkowitz, Atty. Gen. of N. Y. (Arlene Silverman, Asst. Atty. Gen., of counsel), for defendant Wilson.

## MEMORANDUM DECISION

CANNELLA, District Judge.

This action is presently before the Court on plaintiffs' application for a preliminary injunction, Fed.R.Civ.P. 65 (a), restraining the defendants, the Mayor and Fire Commissioner of the City of New York and the Governor of the State of New York, from effecting the closing of eight fire companies in the City of New York. Such closings are scheduled to occur at 9:00 A.M. Saturday, December 14, 1974 (tomorrow). The announcement of the scheduled closings was made by Fire Commissioner O'Hagan on November 27, 1974, by means of his promulgation of Department Order No. 221. The instant application, brought by an order to show cause dated December 11, 1974, is presently before the Court for decision after an evidentiary hearing which was held on December 12 and 13, 1974. For the reasons expressed below, the application is hereby denied.

As is well recognized in this Circuit, on an application for preliminary injunctive relief the moving party has the burden of clearly showing *either* (1) probable success on the merits and possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in their favor. *See, e. g.,* Pride v. Community School Board of Brooklyn, 488 F.2d 321, 324 (2 Cir. 1973).

In this regard, the Court finds that the sole issue upon which plaintiff could prevail on this application is by showing that the equal protection clause of the Fourteenth Amendment is violated by the proposed closings in that the closings have a racially discrim-

inatory impact and effect. (Despite plaintiffs' arguments to the contrary, fire fighting services, although significant to the preservation of life and property, can not be deemed a fundamental constitutional right so as to trigger strict scrutiny. San Antonio School District v. Rodriguez, 411 U.S. 1, 33–34, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (rejecting education as a fundamental right); Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972) (rejecting housing as a fundamental right).) For that reason, it is not the duty of this Court to make inquiry into the political or socio-economic motives or reasons for the City's determination to close these particular firehouses. Rather, the Court's only obligation is to assure itself that in effecting the proposed cutbacks the City has not trammelled upon the constitutional rights of any racial minority group. Thus, in order for plaintiffs to succeed on this application, they must satisfy the standard for injunctive relief set out above by demonstrating *either* racially discriminatory intent or motive as a basis for the proposed closings *or* a racially discriminatory effect resulting therefrom. However, as no "bad faith, ill will or evil motive" is ascribed to the defendants in effecting the alleged racial discrimination which is here at issue, for plaintiffs to prevail hereon they "must show that there [will be] an impingement or a disproportionate effect on nonwhites when the city" eliminates the eight fire companies. Citizens Committee for Faraday Wood v. Lindsay, 507 F.2d 1065 at 1068 (2 Cir. 1974).

■■ In this case, alleging the unequal distribution of municipal services, the Court is guided by Judge Friendly's decision in Beal v. Lindsay, 468 F.2d 287, 290–291 (2 Cir. 1972). In *Beal*, following the Fifth Circuit's landmark decision in Hawkins v. Town of Shaw, 461 F.2d 1171 (5 Cir. 1972) (en banc), aff'g, 437 F.2d 1286 (1971), the court formulated the following standard for the evaluation of equal protection claims in the context of municipal service allocations:

> In a case like this, the City has satisfied its constitutional obligations by equal input even though, because of conditions for which it is not responsible, it has not achieved the equal results it desires. *Cf.* Fessler & Haar, Beyond the Wrong Side of the Tracks: Municipal Services in the Interstices of Procedure, 6 Harv.Civ.Rights—Civ. Lib.L.Rev. 441, 461–63 (1971). How much further [the City must] go beyond equal effort . . . is a matter of municipal policy, not of constitutional command. . . . [I]n determining whether there has been equality of effort, federal courts must not hold municipalities to standards of precision that are unattainable in the process of government. [Footnotes omitted.]

*See also,* Schwartz, Municipal Services Litigation After Rodriguez, 40 Brooklyn L.Rev. 93 (1973). The scrutiny mandated by *Beal* does not come into play, however, absent a showing of racial discrimination by the City in the allocation of its resources. In the ordinary course of events, it is not the province of federal courts to consider or evaluate the quality, quantity or even the inequality, of municipal services. These are questions of policy which are best determined by the political branches of government and not by the judiciary. Thus, to warrant this Court's intervention in the instant matter, the plaintiffs must establish the existence of serious questions going to the racial inequality of the City's proposed closing of these eight fire companies sufficient to require immediate action.

Upon the formulation of the issues by the Court at the initial hearing of this matter, it became incumbent upon the plaintiffs to come forward with proof of the racial composition of each of the areas affected by the proposed closings. At the hearing, the sole evidence produced by plaintiffs on this matter was the testimony of former Dep-

uty Fire Chief Laufer, Fire Lieutenant Montgomery and Assemblyman Griffith. None of these witnesses are demographers or claim any expertise in such endeavors. Taken as a whole, this testimony indicated that seven of the eight response areas served by the companies to be eliminated were populated by between 90–99% minority group residents. However, after a cursory examination of the undifferentiated documentary evidence produced at this morning's hearing, and the census material brought to chambers at 2:00 this afternoon, the Court has serious doubts as to whether more than five of the areas served can even arguably be deemed minority group areas.

Were the record sufficiently developed to permit a finding of fact as to the primarily caucasian populations of the response areas served by Companies E–272, E–13 and E–203, the Court would be disposed to find that the statistics *did not* establish a *prima facie* case of racial discrimination due to unequal effect. Otherwise, as the Supreme Court said in the context of welfare payments in Jefferson v. Hackney, 406 U.S. 535, 548–549, 92 S.Ct. 1724, 1732, 32 L.Ed.2d 285 (1972),

> acceptance of appellants' constitutional theory would render suspect each difference in treatment among the grant classes, however lacking in racial motivation and however otherwise rational the treatment might be. Few legislative efforts to deal with the difficult problems posed by current' welfare programs could survive such scrutiny and we do not find it required by the Fourteenth Amendment. [Footnote omitted.]

■ Nonetheless, for the purposes of this opinion, the Court will assume *arguendo* that seven of the eight areas served by the companies to be eliminated are primarily inhabited by members of racial minority groups. Accepting these figures, the Court, recognizing that "[p]ercentages themselves are certainly not conclusive, but at some point a showing that state action has a devastating impact on the lives of minority racial groups must be relevant," (Jefferson v. Hackney, 406 U.S. 535, 575–576, 92 S. Ct. 1724, 1745, 32 L.Ed.2d 285 (Marshal, J., dissenting)), finds plaintiffs to have made out a *prima facie* case. *See*, Mayor v. Educational Equality League, 415 U.S. 605, 620, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974).

■ However, having done so solely by means of statistical evidence and absent any showing of discriminatory intent, "the burden of proof shifts to the [City] to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." Alexander v. Louisiana, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972). *Accord,* Turner v. Fouche, 396 U.S. 346, 360–361, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); Coleman v. Alabama, 389 U.S. 22, 23, 88 S.Ct. 2, 19 L.Ed.2d 22 (1967) *(per curiam);* Swain v. Alabama, 380 U.S. 202, 208–209, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947); Labat v. Bennett, 365 F.2d 698, 719 (5 Cir. 1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1303, 18 L.Ed.2d 334 (1967); Fessler & Haar, *supra,* 6 Harv.Civ.Rights—Civ.Lib.L.Rev. at 446–456. *Cf.,* Keyes v. School District, 413 U.S. 189, 208–210, 93 S.Ct. 2686, 37 L.Ed.2d 548 (opinion of the court), 236–237, 93 S.Ct. 2701 (Powell, J., concurring) (1973).

Thus, under the cases, the City was obligated to come forward with proof of a nature and quality sufficient to rebut the plaintiffs' *prima facie* showing. To this end, two forms of rebuttal evidence may be invoked. First, a "defendant may challenge the accuracy or completeness of the plaintiff's statistics in portraying a valid profile of service distribution or enjoyment" and, second, "the defendant may offer proof of a rationale for the [alleged discrimination] which, if credited by the trier, would overcome the established inference of legally forbidden discrimination."

Fessler & Haar, *supra*, at 447–48. Absent such rebuttal, plaintiffs' *prima facie* case of racial discrimination would be established and defendants would then be required to demonstrate a "compelling interest" which would justify its discriminatory action. In the instant case, however, the Court finds defendants to have satisfactorily rebutted the *prima facie* case advanced by plaintiffs, and, therefore, finds no need to look to any "compelling interest" as justification for the City's conduct. *Cf.,* Hawkins v. Town of Shaw, 461 F.2d at 1179–1183 (Roney, J., dissenting).

 It is not the subject of contention that the City of New York is presently in the throes of severe economic pressures and a budget crisis. In response thereto, the City fathers have determined that a budget reduction is necessary if the City is to weather the present financial storm and, this, in turn, has led to a decision to cut back on certain municipal services, including the presently challenged decision to close down eight fire companies. In this regard, it is undoubtedly within the proper province of the municipality to determine how limited resources are best utilized. In meeting their responsibilities to the City's inhabitants municipal executives may allocate manpower and resources in such fashion as their best judgment indicates. It is not the proper function of this Court to second-guess or evaluate the wisdom of such determinations by the City. Rather, we must only determine whether such decisions are racially discriminatory in impact or effect, and if so, whether or not they go beyond the constitutionally permissible pale.

 The City, through the testimony of Chief Bishop, the affidavit of Fire Commisioner O'Hagan and the introduction of various reports which were independently prepared over a period of time by the Rand Institute, has demonstrated to the satisfaction of this Court that once the determination to close cer-

tain firehouses and eliminate certain fire companies had been arrived at, the specific decision as to which fire companies would be eliminated was premised solely upon the neutral, non-racial, scientific and empirical data available to it at that point in time. *Compare,* United Farmworkers Housing Project, Inc. v. City of Delray Beach, 493 F.2d 799 (5 Cir. 1974). Using this data, it was determined that the elimination of these eight companies would best effectuate the necessary budget reduction, while at the same time minimizing to the greatest extent possible the detrimental effects of the cutback. That the ordered closings will take place in the areas in which they will, is, in the opinion of the Court, a fortuitous circumstance resulting from the application of the empirical data at hand.

The Court finds the following statement of Commissioner O'Hagan to accurately reflect the facts giving rise to the City's decision to close these eight fire companies.

> In initiating the reductions under attack we have carefully studied all the alternatives and the changes are those which will have the least impact on the ability of the Fire Department to provide protection for the City. The decision regarding which auxiliary and administrative services to discontinue was reached after detailed and careful consultation with the Borough Commanders and other senior staff officers. The main consideration in each instance was the ability of the Department to absorb these services and continue to function effectively. These changes were not based on or motivated by any racial considerations as plaintiffs charge but were predicated on objective analysis and sound fire protection principles . . . .

O'Hagan Affidavit at ¶ 6. As the Commissioner further stated:

> The Fire Department carefully and continually reviews the relationship between the use of its resources and the demand for its services. In the

course of this review we have surveyed all regions of the City and classified each according to its basic fire hazards and pattern of alarms. The analysis identified seven different types of fire hazards in 21 separate regions throughout the City. We then employed a resource allocation model, developed by the New York City Rand Institute and the Department's Division of Planning and Operation Research, to identify areas of the City where the average response time, when compared to similar type areas, were disproportionately lower. We then carefully selected companies within those areas after calculating the effect on response distance, response times and workload. Each company covered an area where the capacity of neighboring companies is sufficient to provide adequate fire protection.

O'Hagan Affidavit at ¶ 9. It was only after the Department had concluded such objective analysis that it reached a decision as to which fire companies would be terminated. In light of such a showing by the City, the Court finds that the defendants have rebutted plaintiffs' *prima facie* case by presenting facts which clearly "overcome the established inference of legally forbidden discrimination." Once the City had determined that certain firehouse closings were necessary to meet its fiscal responsibilities, it acted to effectuate this goal solely upon a review of the relevant objective and scientific-empirical data. Thus, this is not a case where the justifications presented by the defense were developed after the fact in an attempt to dissipate the consequences of otherwise arbitrary action or intentionally discriminatory conduct. Similarly, there is no evidence of any prior discrimination which would cast doubt upon the otherwise legitimate nature of the actions taken by the City. Rather, the

evidence suggests that the City has acted in such fashion as would equalize the distribution of fire protection services and, indeed, it may well be perceived as having acted to maximize fire resources in the so-called "ghetto areas." Finally, the Court notes, that the City's justification in the present case is consonant with the principle of employing the least restrictive alternative and may well rise to the level of a "compelling interest", in that, given limited financial resources, the defendants have sought to carry out the closings in such manner as would best maximize fire protection services while, at the same time, continuing to minimize the risk of loss of life and property resulting from fire throughout all areas of the City of New York.

Thus, having concluded that the City's action is not racially discriminatory in nature, the Court need not consider the principles enunciated by Judge Friendly in Beal v. Lindsay. The plaintiffs, having failed to sustain their burden of clearly demonstrating either "probable success on the merits" or "sufficiently serious questions going to the merits to make them a fair ground for litigation," the Court need not consider questions going to "possible irreparable injury" or a balancing of the hardships. *Compare,* Maye v. Lindsay, 352 F.Supp. 1120 (S.D.N.Y.1972).

Accordingly, plaintiffs' application for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure is hereby denied in all respects. In order that any appellate review which might be sought by the plaintiffs might be expedited, the Court hereby declines to enter a stay of its decision pending appeal, Fed.R.Civ.P. 62(c) and Fed.R.App.P. 8, thereby allowing plaintiffs leave to seek such relief from the Court of Appeals or a circuit judge in the first instance.

It is so ordered.