SCHOOL CROSSING GUARDS ASSOCIATION OF the CITY OF NEW YORK, INC., by Barbara Morgan, President, and Barbara Morgan, Individually, Plaintiffs,

v.

Abraham D. BEAME, Mayor of the City of New York, Michael J. Codd, Police Commissioner of the City of New York, Ray Marshall, Secretary, United States Dept. of Labor, the City of New York, Defendants.

No. 77 Civ. 3859–CLB.

United States District Court, S. D. New York.

Nov. 1, 1977.

Kleinberg, Friedman & Mandel by Chester S. Mandel, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty., S.D. N.Y., New York City, for defendant Ray Marshall by Louis G. Corsi, Asst. U. S. Atty., New York City.

W. Bernard Richland, Corp. Counsel by H. Kenneth Wolfe, Asst. Corp. Counsel, New York City, for Abraham D. Beame, Michael J. Codd and the City of New York.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

Defendants in this action have moved, pursuant to Rule 12(b), F.R.Civ.P., to dismiss the complaint for, among other things, failure to state a claim upon which relief can be granted. At issue is whether plaintiffs have standing to raise the issues mentioned below. I conclude they do not.

Plaintiffs are the School Crossing Guards Association of the City of New York, Inc. (hereinafter the "Association"), and the Association's President. Members of the Association are former school crossing guards hired by the City of New York (hereinafter the "City") to provide traffic protection to school children at various intersections throughout the five boroughs of New York City. Under the comprehensive statutory scheme imposed by state and local laws, the Association is and has been the certified exclusive collective bargaining agent for all school crossing guards employed by the City, and may be regarded as a labor union.

Defendants are the City; its Mayor, Abraham D. Beame; its Police Commissioner, Michael J. Codd (hereinafter sometimes referred to collectively as the "municipal defendants"); as well as Ray Marshall, Secretary, United States Department of Labor (hereinafter "Labor").

The position of School Crossing Guard was created by the City in 1954 under § 434a–16.1 of the New York City Administrative Code, 2-A N.Y.C. Charter and Code, § 434a–16.1.[1] The program was administered by the Police Commissioner, who was

---

1. Section 434a–16.1 provides as follows:
   "*School crossing guards.*
   —a. Notwithstanding the provisions of section 434a–16.0 of the administrative code of the city of New York, the police commissioner may employ persons to be known as school crossing guards, *for such periods of time as in his discretion he deems advisable.* Such school crossing guards shall be empowered to direct pedestrian and vehicular traffic at locations to which they may be assigned, and shall perform such other related duties as may be prescribed by the police commissioner.

   —b. *Nothing contained herein shall be construed to constitute such school crossing guards members of the police force, or to entitle them to the privileges and benefits of the members of the police force, or to become members of the police pension fund.*
   —c. The police commissioner shall have authority to promulgate rules and regulations governing the conduct of such school crossing guards. He shall prescribe the insignia or uniform to be worn by the guards while on duty. (As added by L.L.1954, No. 34, June 17). (Emphasis added).

granted authority to promulgate rules and regulations governing the employment of such Crossing Guards. The Guards were not, however, members of the police force, nor were they entitled to police force benefits, privileges or pensions.

By letter of June 19, 1975, the Police Commissioner notified the Association's members that their services were being terminated, effective June 30, 1975, due to the City's "fiscal crisis," but that they would be considered for rehiring "when fiscal conditions permit." No School Crossing Guards have been employed by the City during the period between June, 1975 and the filing of this action on August 8, 1977.[2]

The present controversy centers around the application of federal funds, with which the City proposes to finance a "School Intersection Safety Project ("Safety Project"), available to the City under Title VI of the Comprehensive Employment and Training Act of 1973, 29 U.S.C. § 801, et seq., as amended by the Emergency Jobs Programs Extension Act of 1976, 29 U.S.C. § 962, et seq. (Supp.1977) (hereinafter "CETA").

CETA is a federally funded statutory program to provide job training and employment opportunities to disadvantaged and unemployed persons. 29 U.S.C. § 801. There are two employment programs under CETA: Title II, 29 U.S.C. §§ 841–51, as amended by the Emergency Jobs Programs Extension Act of 1976, Pub.L. 94–444, and Title VI, 29 U.S.C. §§ 961–66, as amended by the Emergency Jobs Programs Extension Act of 1976, Pub.L. 94–444.

Local and state governmental units are "prime sponsors" which prepare and submit proposals for public employment programs for the approval of the Secretary of Labor through regional offices of Labor's Employment and Training Administration (hereinafter the "ETA"). The Secretary of Labor, not the courts, is charged with assuring that CETA's requirements are fulfilled and that the national purpose, expressed in 29 U.S.C. § 801 is served by the proposed program. To be eligible for employment on a Title VI funded job, an individual must reside within the prime sponsor's jurisdiction and must have been unemployed for at least 15 days prior to hiring. 29 U.S.C. §§ 845(c)(3), 962(c) and 964(b)(2). When CETA was amended in 1976, an additional requirement was imposed: the applicant for a CETA Title VI job in effect must now show that he or she is among the long-term unemployed, or an Aid to Dependent Children recipient, and that his or her family income is $7,580.00 or less.[3] There is no similar income restriction applicable to participants in Title II funded job programs.

In February, 1977, the ETA for the region including New York City approved an application by the City for training and employment funds under Titles II and VI of CETA. This proposal did not include the aforementioned Safety Project.

In May, 1977, the ETA advised the City (and other recipients of CETA funds) to modify their proposals because additional CETA funds had been allocated. On Au-

---

**2.** In 1975, the Association's President was the petitioner in an Article 78 proceeding in New York State Supreme Court, New York County. The relief sought there was reinstatement of the school crossing guards, or reinstitution of the crossing guards program. The state court found that the termination was "a discretionary governmental act . . . not subject to judicial review;" that it was for the City to make determinations with respect to allocation of its limited fiscal resources; and that the court would not "evaluate the wisdom of such determination. . . ." *In the Matter of the Application of Barbara Morgan v. Abraham D. Beame,* Index No. 15281/1975 (Sept. 17, 1975).

**3.** The statute [29 U.S.C. § 968(a)(2)] provides:

"[E]ach prime sponsor shall determine that any person to be employed in any such public service job . . . (2) is not a member of a household which has current gross family income, adjusted to an annualized basis (exclusive of unemployment compensation and other public payments which such individual will be disqualified from receiving by reason of employment under this subchapter) at a rate exceeding 70 per centum of the lower living standard income level."

Federal regulations adopted by Labor determined that 70 per cent of the lower living standard in New York City for a family of four is $7,580.00 42 Fed.Reg. 40346 at 40348 (August 9, 1977).

gust 16, 1977 the City submitted its Safety Project proposal to the ETA in which it requested "in excess of $3,000,000 to hire 1004 individuals to fill the position of <u>School Intersection Safety Associate</u> ("Safety Associate"), whose duties would be to direct pedestrian and vehicular traffic at selected school crossing intersections throughout New York City . . . from September, 1977 to June 1978." Labor's Notice of Motion and Affidavit, Affidavit of Fitzroy I. Herbert, ¶ 3) (underlining added by the Court). It must be obvious to all that a "School Intersection Safety Associate" is, and is understood by all to be, the same as a "School Crossing Guard." While plaintiffs suggest an ulterior purpose, the Court regards use of this new high-flown title as nothing more than the same kind of currently prevalent euphemistic bureaucrat jargon which has renamed prisons as correctional centers, prison keepers or guards as correctional officers, garbagemen as sanitation engineers and labor unions as collective bargaining agents.

Before the Safety Project proposal was actually submitted to Labor, the Association, by an order to show cause submitted August 9, 1977, sought a preliminary injunction in this action to restrain the defendants from using federal funds to hire non-union Crossing Guards.[4]

The Association's application for preliminary injunctive relief was heard on August 30, 1977 before Judge Vincent L. Broderick of this Court, then assigned to Part I. At the same time, oral argument was heard also on defendants' motions to dismiss the complaint. Judge Broderick filed a Memorandum Decision on September 12, 1977, which is here quoted in full:

"The injury, if any, to plaintiffs if the preliminary relief sought is denied and the City is permitted to proceed with the funding of the program with Title VI CETA Funds [statutory citation omitted] will be that they will not at this time be employed as school crossing guards.

Should plaintiffs ultimately prevail, this Court has the power to make them whole by ordering that they be hired and by awarding back pay. *Moore v. Kibbee,* 381 F.Supp. 834 (E.D.N.Y.1974). Accordingly, this is not a case in which the extreme remedy of a temporary restraining order or a preliminary injunction is warranted, plaintiffs having failed to make the requisite showing of irreparable injury. *State of New York v. Nuclear Reg. Comm'n.,* 550 F.2d 745, 750 (2d Cir. 1977)."

■ Judge Broderick's above quoted decision specifically denied preliminary injunctive relief. It did not refer to the motions to dismiss. Obviously it was helpful to hear argument on these motions as bearing on plaintiffs' likelihood of probable success on the merits, which affects the grant of any preliminary injunction. But the determination of such a motion to dismiss, in itself, can hardly be regarded as an "emergency" within the meaning of Rule 6(B)(2) of the local IAC Rules of this Court. For that reason, plaintiffs' suggestion that Judge Broderick's decision has, by implication, denied the motions to dismiss, is rejected as unfounded.

On August 19, 1977 the Association filed a written objection to the Safety Project with Labor and the ETA. That objection consisted of a copy of the complaint and affidavit in this action, together with a letter of transmittal in which the Association reaffirmed the positions it maintains in this litigation, and asked the ETA to require the City to waive the income limitation provisions of Title VI so that the Association's members could be re-hired. The Association maintains, and I assume for the motion, that most of its members cannot meet the income limitation requirement.

The ETA investigated the objections raised by the Association, and by letter dated October 13, 1977 denied the Association's objections to funding the Safety

---

4. CETA employees generally are union members. *Some of them are members of, for example, the American Federation of State, County* and Municipal Employees. New York Times, Tuesday, October 25, 1977, p. 1.

Project under CETA Title VI.[5] The ETA did advise the Association that it might seek further administrative relief by requesting a hearing before an Administrative Law Judge, provided for under 29 C.F.R. § 98.46(c).

As matters now stand, the Association has expressed an intention to pursue an administrative remedy with the Administrative Law Judge, but it continues to assert that it need not do so, and declines to discontinue this lawsuit voluntarily during pendency of the administrative hearing.

The Association alleges that use of CETA funds in the manner proposed will violate CETA regulations; will constitute an unfair labor practice, or "union busting," in that inexperienced, non-union crossing guards will be hired in place of the experienced union members laid off in 1975; and will violate certain statutory and Constitutional rights of its members, including the right to equal protection of the laws.

Labor contends that plaintiffs' complaint should be dismissed because they have no standing to assert their claims and have failed to exhaust their administrative remedies.

The municipal defendants assert, in effect, that plaintiffs do not, and cannot, state a claim, under federal law in that the former Crossing Guards are not covered by the Taft-Hartley Act; insofar as the pendent, or state law claims asserted, they are not permanent employees entitled to preferred status under New York Civil Service Law § 80; and that this Court should not interfere with the allocation of City funds.[6]

As the United States Supreme Court held in *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975):

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. . . .

In its constitutional dimension, standing imports justiciability; whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III. This is the threshold question in every federal case, determining the power of the court to entertain the suit." (Citations omitted).

■ This concept of justiciability requires that the plaintiff allege and show actual injury "capable of resolution and redress in the federal courts." *Evans v. Lynn*, 537 F.2d 571, 591 (2d Cir. 1976) (*en banc*), cert. denied sub nom. *Evans v. Hills*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977). Thus, failure to show standing results in failure to state a claim upon which relief can be granted, and requires dismissal of the complaint pursuant to Rule 12(b), F.R.Civ.P.

■ As held in *City of Hartford v. Town of Glastonbury*, 561 F.2d 1032 (2d Cir., 1977)

---

5. This action by the ETA made the CETA Title VI funds available to the City to implement its Safety Project with, however, the admonition that the City might be liable for repayment of those funds if Labor should ultimately determine that the CETA funds were improperly paid out. This possibility arises because although, at the time its proposal is submitted, the City must certify that the proposal complies with CETA's requirements, Labor also makes its own independent administrative determination with respect to such compliance.

6. The Complaint, ¶ 1, pleads subject matter jurisdiction as follows:

"That jurisdiction of this Court is invoked by virtue of Title 28 USC 1331; 1346(a), in that the action arises under the 14th Amendments [Amendment] United States Constitution; Comprehensive Employment and Training Act (CETA), and general Federal Revenue

Sharing Statutes of the United States, and the United States is a defendant. The amount in controversy exceeds $10,000.00."

Because we find the Complaint fails to state a federal claim, for want of standing, and accordingly that there is no basis to exercise pendent jurisdiction over claims founded in state law, we need not consider whether there is subject matter jurisdiction over a municipality for relief based on the Fourteenth Amendment. See *Brault v. Town of Milton*, 527 F.2d 730 (2d Cir. 1975) (*en banc*); *Fine v. City of New York*, 529 F.2d 70 (2d Cir. 1975) and *Gentile v. Wallen*, 562 F.2d 193 (2d Cir. 1977).

Suffice it to say that the references to CETA and "Federal Revenue Sharing Statutes of the United States" are insufficient to support subject matter jurisdiction. The United States is not a defendant here, nor could it be.

(*en banc*), in order to have standing to challenge a federal funding grant "a plaintiff must show injury; he must trace it to the defendant's allegedly unlawful acts; and he must show that the remedy he seeks is likely to redress his injury." We examine the injuries alleged by plaintiff. The Association alleges that if this CETA Title VI funding is allowed, its members will not be re-hired as Crossing Guards, in part because they cannot meet the income limitations imposed by Title VI of CETA. The Association members were not laid off from their jobs because of the proposed Title VI funding of the Safety Project. Their services were terminated ostensibly due to the City's fiscal crisis in 1975. The Administrative Code provision under which plaintiffs' former positions were created provided that their employment was to be at the discretion of the Police Commissioner. Nowhere in the complaint, motion papers or briefs do plaintiffs allege that they would have been re-hired at this time if CETA Title VI funding had not become available. Thus, the availability of and proposed grant of CETA Title VI funds to the City is not preventing the re-hiring of the Association's members. The Association has not shown that its claimed injury of not having its members re-hired as Crossing Guards was caused by the unlawful conduct of any defendant.

Nor has the Association shown that the remedy it seeks is likely to redress the claimed injury. The Association seeks to enjoin the Title VI funding. Since it is not claimed, and cannot be alleged, that the City would re-hire the Association's members at this time were Title VI funds unavailable, withholding these federal funds would not restore them to their former positions as School Crossing Guards.

■ Plaintiffs, therefore, lack standing to maintain this lawsuit.

Plaintiffs argue that the Safety Project should be financed "with general funds of the City of New York or with Federal Revenue Sharing Funds or Title II of CETA," so that its members could be re-hired. While this might be a reasonable procedure to follow, this Court will not substitute its own judgment, or plaintiffs' opinion, as to how municipal affairs should be conducted, for the determinations of the duly elected and appointed City officials as to the allocation of City financial resources. See, *Towns v. Beame*, 386 F.Supp. 470 (S.D.N.Y. 1974), denying an injunction to restrain the City from closing eight fire companies in the City of New York. The court there noted the City's economic crisis and observed:

"In this regard, it is undoubtedly within the proper province of the municipality to determine how limited resources are best utilized. In meeting their responsibilities to the City's inhabitants municipal executives may allocate manpower and resources in such fashion as their best judgment indicates. It is not the proper function of this Court to second-guess or evaluate the wisdom of such determinations by the City. Rather, we must only determine whether such decisions are racially discriminatory in impact or effect, and if so, whether or not they go beyond the constitutionally permissible pale." (474).

Here, there is no allegation of racial discrimination.

■ The Association is further barred from maintaining this lawsuit because it has failed to exhaust its administrative remedies. See, *Rivera v. City of New York*, 75 Civ. 4305, Memorandum (S.D.N.Y. Sept. 16, 1976). The ETA, although it denied the Association's objections to CETA Title VI funding of the City's Safety Project, advised the Association that it could request a hearing before an Administrative Law Judge pursuant to Department of Labor regulations. The applicable regulation, § 98.46(c) provides that:

"An opportunity for a public hearing shall be extended in each of the following instances:

\*    \*    \*    \*    \*    \*

(c) [W]hen the Secretary determines that fairness and the effective operation of programs under the act would be furthered by an opportunity for a public hearing . . . .."

In addition, § 98.40(b) of the regulations provides that:

"It is the policy of the Secretary to receive information concerning alleged violations of any title of the Act [CETA] and the regulations promulgated pursuant thereto from *any person*, or any unit of Federal, State or local government." (Emphasis added).

Thus, the regulations clearly afford administrative redress, and, in any event, the Association has been specifically informed that it is entitled to an administrative hearing. Accordingly, the Administrative Law Judge will determine whether the proposed funding violates CETA regulations as the Association maintains.

■ The Association has asserted a federal claim that its members' Constitutional right to equal protection will be violated by Title VI funding. The essence of equal protection is that persons similarly situated with respect to challenged government action shall be treated similarly. *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Different treatment of persons similarly situated may be justified if reasonably related to an appropriate government interest. It is the stated purpose of CETA

"to provide job training and employment opportunities for economically disadvantaged, unemployed, and underemployed persons, and to assure that training and other services lead to maximum employment opportunities and enhance self-sufficiency by establishing a flexible and decentralized system of Federal, State, and local programs." (CETA § 801).

■ All persons who meet the criteria set forth in CETA for eligibility for Title VI jobs will be considered for such employment. The criterion which the Association claims that its members will not be able to meet, and herein lies the claimed unconstitutional discrimination, is the income limitation provided for by the Extension Act, 29 U.S.C. § 968(a). Since CETA's avowed purpose is to create jobs and furnish employment to those whose need for such jobs is perceived to be the greatest, it cannot be said that the income limit is not reasonably related to effecting such a purpose, or facially unconstitutional as a denial of equal protection.

■ The Association claims further that use of CETA Title VI funds for the City's Safety Project will constitute "union busting"—an unfair labor practice, in violation of the Taft-Hartley Act, 29 U.S.C. § 141, *et seq.* A short but complete answer to this point is found in the fact that the Association's members are clearly not "employees" within the Taft-Hartley Act, because their employer, the City of New York, is a political subdivision of the State of New York. See 29 U.S.C. §§ 152(2) and (3).

Defendants' motions to dismiss the complaint are granted.

So Ordered.