Donald R. LEE, Phyllis Johnson, David Collins, Erwin Johnson, John Medige and Norman Goldfarb on behalf of their children, themselves and all citizens of the United States and residents of New York State similarly situated, Plaintiffs,

v.

Ewald B. NYQUIST, Commissioner of Education of the State of New York, the Board of Regents of the University of the State of New York, Joseph Manch, Superintendent of the Board of Education of the City of Buffalo, and the Board of Education of the City of Buffalo, Defendants,

Frank P. Chropowicki, Charlotte King, Patricia Hollenbeck, Jerome Walter, and D. Laurie Pawlowski, Defendants-Intervenors.

Civ. 1970–9.

United States District Court, W. D. New York.

Argued June 26, 1970.

Decided Oct. 1, 1970.

2d 781, reh. den. 395 U.S. 941, 89 S.Ct. 2002, 23 L.Ed.2d 459. But none of these cases are of aid to petitioner in this case.

Herman Schwartz and David J. Mahoney, Jr., Buffalo, N. Y. (Jack Greenberg, Sylvia Drew, New York City, of counsel), for plaintiffs.

Jean M. Coon, Asst. Atty. Gen., State of New York (Louis J. Lefkowitz, Atty. Gen., State of New York, Ruth Kessler Toch, Sol. Gen., of counsel), for defendants Ewald B. Nyquist and the Board of Regents of the State of New York.

Anthony Manguso, Corp. Counsel, City of Buffalo, N. Y., and Herbert B. Forbes, Asst. Corp. Counsel, on brief for defendants Board of Education of the City of Buffalo and Joseph Manch, Superintendent of the Board of Education of the City of Buffalo.

Denis M. Hurley, Brooklyn, N. Y. (John F. Haggerty, Hurley, Kearney & Lane, Brooklyn, N. Y., of counsel), for defendants-intervenors.

Kaye, Scholer, Fierman, Hays & Handler, New York City, submitted a brief amicus curiae for the National Education Assn. of the United States, New York State Teachers Assn., and Buffalo Teachers Federation.

Burt Neuborne, New York Civil Liberties Union, New York City, submitted a brief amicus curiae for the plaintiffs in Shepard et al. v. Board of Education of the City of New York et al.

Before HAYS, Circuit Judge, HENDERSON, Chief District Judge, and BURKE, District Judge.

HAYS, Circuit Judge:

The question in this case is whether Section 3201(2) of the New York Education Law (McKinney 1970), enacted as Chapter 342, [1969] Laws of New York, 1306, denies "to any person * * * the equal protection of the laws" in violation of the Fourteenth Amendment of the Constitution of the United States.

Section 3201(2) of the New York Education Law provides as follows:

2. Except with the express approval of a board of education having jurisdiction, a majority of the members of such board having been elected, no student shall be assigned or compelled to attend any school on account of race, creed, color or national origin, or for the purpose of achieving equality in attendance or increased attendance or reduced attendance, at any school, of persons of one or more particular races, creeds, colors, or national origins; and no school district, school zone or attendance unit, by whatever name known, shall be established, reorganized or maintained for any. such purpose, provided that nothing contained in this section shall prevent the assignment of a pupil in the manner requested or authorized by his parents or guardian, and further provided that nothing in this section shall be deemed to affect, in any way, the right of a religious or denominational educational institution to select its pupils exclusively or primarily from members of such religion or denomination or from giving preference to such selection to such members or to make such selection to its pupils as is calculated to promote the religious principle for which it is established.

Section 3201(2) prohibits state education officials and appointed school boards from assigning students, or establishing, reorganizing or maintaining school districts, school zones or attendance units for the purpose of achieving racial equality in attendance. By the terms of the statute, elected boards continue to have power to engage in such activities.

Plaintiffs, parents of children attending the Buffalo public schools, governed by an appointed school board,[1] brought this suit on behalf of themselves, their children and all others similarly situated to enjoin the enforcement of Section 3201(2) and to declare the statute unconstitutional on the ground that it denies equal protection of the laws. Plaintiffs' complaint is that Section 3201(2) invidiously discriminates against efforts to eliminate racial imbalance in the public schools.

Defendants are the Board of Regents of the University of the State of New York, the Commissioner of Education of the State of New York, the Superintendent of the Board of Education of the City of Buffalo and the Board of Education of the City of Buffalo. Intervening as defendants are other parents of children attending Buffalo public schools, who are opposed to the position advocated by the plaintiffs.

This three-judge court was convened to hear and determine this action. 28 U.S.C. § 2284 (1964); see 28 U.S.C. § 2281 (1964). We hold that Section 3201 (2) denies the equal protection of the laws guaranteed by the Fourteenth

1. The Board is appointed by the Mayor of Buffalo, subject to confirmation by the city's Common Council. See N. Y. Education Law § 2553(3) (McKinney 1970). There are also appointed Boards of Education in New York City, Yonkers and Albany. See N. Y. Education Law §§ 2253, 2590–b (McKinney 1970). The statute provides that as of the first Tuesday in May, 1971, five members of the New York City Board shall be elected and two shall be appointed by the Mayor. N. Y. Education Law § 2590–b(1) (McKinney 1970).

Amendment and that its enforcement must be permanently enjoined.

### I.

This court's jurisdiction to award the relief plaintiffs request is clear and is not questioned by defendants. See 42 U.S.C. §§ 1983, 1988 (1964) and 28 U.S. C. §§ 1343(3), 2201 (1964). Defendants, however, do contest plaintiffs' standing to bring the action; therefore, we turn first to that issue.

In Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), the Supreme Court said: "[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." This in turn depends upon whether the party seeking relief has " 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)," Flast v. Cohen, supra, 392 U.S. at 99, 88 S.Ct. at 1952.

■ In resolving the issue, there are two inquiries to be made. First, whether there is a "logical nexus" between the status plaintiffs assert and the claim sought to be adjudicated,[2] Flast v. Cohen, supra at 102, 88 S.Ct. 1942, and, second, whether plaintiffs are harmed in fact, economically or otherwise, by the

law against which their complaint is directed. See Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

■ Plaintiffs clearly satisfy the "logical nexus" test. They are parents of children attending Buffalo public schools, suing on behalf of themselves, their children and all others similarly situated.[3] Some of their children are in schools where there is a high degree of racial concentrations.[4] Their complaint is that Section 3201(2) invidiously discriminates against efforts to promote equal educational opportunity by alleviating racial imbalance in the public schools. Consequently there is a logical nexus both between plaintiffs' status and the legislation attacked and between their status and the constitutional infringement alleged. See Flast v. Cohen, supra, 392 U.S. at 102–103, 88 S.Ct. 1942. Plaintiffs, for themselves and their children, are the logical parties to attack the constitutionality of a law directly affecting the state's educational policy. They are also proper parties to assert the right to be free from racial discrimination in public education. Their interest is both personal and direct. See Adler v. Board of Education, 342 U.S. 485, 503, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (dissenting opinion of Frankfurter, J.). Cf. Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953).

It is also clear that plaintiffs are harmed by Section 3201(2), in that the educational policies to which their chil-

---

2. The Court's statement in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), that the question of standing, apart from the case or controversy test, depends upon "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected * * * by the * * * constitutional guarantee in question," would appear to be an alternative formulation of the "logical nexus" test.

3. Although plaintiffs failed to allege in their complaint that they are parents of children attending Buffalo public schools, this sufficiently appears from their affidavit in opposition to defendants' motion to dismiss. See Fed.R.Civ.P. 15(b).

4. For instance, plaintiff Phyllis Johnson's child is in a junior high school 99.7% black; the children of Erwin Johnson (who is white) are in a school 95.6% white.

dren are subjected are directly affected by the operation of the statute.

Although there may be no constitutional duty to undo *de facto* segregation, see Offermann v. Nitkowski, 378 F.2d 22, 24 (2d Cir. 1967), it is by now well documented and widely recognized by educational authorities that the elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial. to all students, both black and white.[5] The Regents of the University of the State of New York in their 1969 Restatement of Policy on Integration and the Schools said at p. 3:

"[T]he elimination of racial segregation in the schools can enhance the academic achievement of non-white children while maintaining achievement of white children and can effect positive changes in interracial understanding for all children. The latter consideration is paramount. If children of different races and economic and social groups have no opportunity to know each other and to live together in school, they cannot be expected to gain the understanding and mutual respect necessary for the cohesion of our society. The stability of our social order depends, in large measure, on the understanding and respect which is derived from a common educational experience among diverse racial, social, and economic groups—integrated education. The attainment of integrated education is dependent upon the elimination of racial segregation in the schools."

Plaintiffs' complaint is that Section 3201(2) impedes efforts to institute programs aimed at reducing racial imbalance in the schools. Defendants contend that plaintiffs lack standing to make this complaint since there is no showing that Section 3201(2) has affected Buffalo's plans in this regard. It is clear, however, as Superintendent Manch's deposition indicates, that Section 3201(2) severely inhibits the creation and siting of new middle schools and the adjustment of zone lines so as to achieve racial balance, as well as the use of other devices aimed at reducing racial segregation in the Buffalo public schools.[6] The

5. See Integration and the Schools, A Restatement of Policy by the Regents of the University of the State of New York 4–6 (1969) and Racial and Social Class Isolation in the Public Schools, A Report to the Board of Regents of the University of the State of New York (1969), which contains an extensive bibliography on this point. Also see the authorities cited in Hobson v. Hansen, 269 F.Supp. 401, 504–505, nn. 185–194 (D.D.C.1967), aff'd sub nom. Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

6. Past programs instituted by Buffalo in an effort to improve racial balance have included the following:

A voluntary open enrollment program under which 2,600 black children are bussed from inner city areas to the periphery.

The use of portable classrooms.

The creation of a new peripheral school, the West Hertle Middle School, into which 450 black children are bussed.

The redistricting of Bennett High School, which will result in a reduction in the percentage of black students in attendance from 37% to 32%.

Project Sit-Up at School #54, a program designed to stabilize the racial balance at a transitional school where white parents were gradually sending their children elsewhere and which has resulted in an increase in the white student population from 46% to 48% over a three year period.

The Buffalo Board of Education presently has under consideration a plan for the creation of twelve new middle schools sited so as to effectuate racial balance.

Superintendent Manch has stated that Section 3201(2) puts all such plans in jeopardy. Defendants' contention that the plans for new middle schools are impeded only by the City Council's refusal to appropriate funds misses the point, since it is quite clear that any attempt by school officials to implement such plans would violate the statute. For instance, a plan similar to Project Sit-Up at School #54 could not be undertaken since it will no longer be possible to change existing school district boundaries so as to counter

statute denies appointed officials the power to implement non-voluntary programs for the improvement of racial balance. Voluntary plans for achieving racial balance, however, have not had a significant impact on the problems of racial segregation in the Buffalo public schools; indeed it would appear that racial isolation is actually increasing.[7]

Under the circumstances, we need not await action by a state official in direct violation of the statute before considering the claim plaintiffs raise. The controversy is sufficiently crystallized. Cf. Otey v. Common Council, 281 F.Supp. 264, 274 (E.D.Wis.1968); Holmes v. Leadbetter, 294 F.Supp. 991 (E.D.Mich.1968).

Defendants' contention that we should wait for a state court interpretation of the statute is also without merit. The statute is unambiguous on its face and clearly applies to all efforts to achieve racial balance, including such efforts by a school district subject to a pre-existing order to eliminate segregation in its schools, as is Buffalo.[8] Without the express approval of a local elected board or the consent of his parents *"no student shall be assigned or compelled to attend any school"* and *"no school district, school zone or attendance unit, by whatever name known, shall be established, reorganized or maintained"* for that purpose. The Commissioner of Education has so interpreted the statute,

---

the effect of a shift in the racial composition of the community.

The following testimony is instructive in this regard:

BY MR. SCHWARTZ:

Q Dr. Manch, have you and your office considered the impact of the second part of this Statute dealing with zoning and districting for the purpose of racial balance?

A We have, and I can conceive there would be very, very great difficulty when we try to locate the new middle schools and assign pupils to them. In the case of the middle schools, we, of course, worked in conformity with the new law, and all of the children who attend that school had to get permission from their parents. We have [to have] signed statements permitting them to go and this would be a very difficult, time-consuming thing, and possibly frustrating activity, if we had to do this, in talking about six middle schools, if not more.

Q Isn't it clear under the Statute, Doctor Manch, that you cannot set up even a district in a certain way if the purpose is to improve racial balance?

A Yes, this is what it says.

Q And isn't it clear also that your whole middle school program, which is designed to improve racial balance by siting them in certain places, and setting up certain attendance zones is jeopardized by Chapter 342?

A Yes, as I said publicly, I think it is a bad law.

Q Now, what will happen to racial isolation in Buffalo if you cannot do this kind of pupil assignment and zoning and districting and rezoning?

A Obviously the racial isolation will get more severe. As I have indicated a number of times, if we are blocked in terms of this kind of legislative act from taking the steps that are open to us, removing children, since we cannot move buildings, we cannot make much more progress than we have, it seems to me.

Q Isn't that even more so with respect to the fact that you cannot set up attendance zones?

A Yes, it is.

Deposition of Superintendent Manch, at 29–30.

7. Commissioner Nyquist reports that the number of schools in Buffalo in which the percentage of Negro students is 90% or more has increased from 20 in 1966 to 22 in 1969. See Answers to Interrogatories, Ewald B. Nyquist, Commissioner of Education of the State of New York, at 7. Also see Board of Education, Buffalo, New York, Ethnic Census of the Buffalo Public Schools 1969–70.

8. In 1965, Buffalo was ordered to devise and implement a feasible plan for eliminating racial imbalance in its schools. See In the Matter of the Appeal of Yerby Dixon, N. Y. Department of Education Decision No. 7470 (February 15, 1965). The Commissioner of Education has made it clear that he cannot, under the statute, direct or enforce pupil assignments or school district reorganization to promote racial balance in the Buffalo public schools which go beyond moves already ordered in the Yerby Dixon case. See Answers to Interrogatories at 5.

see Matter of Forbes, 8 Ed.Dept.Rep. 195 (1969) [9] and defendants' arguments to the contrary involve interpretations of the statute too tortuous to warrant serious consideration.[10]

The Buffalo schools, governed by an appointed board, are directly affected by the operation of Section 3201(2), and plaintiffs have standing to complain of its unconstitutionality. See School District of Abington Township v. Schempp, 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Zorach v. Clauson, 343 U.S. 306, 309 n. 4, 72 S.Ct. 679, 96 L.Ed. 954 (1952); People of State of Ill. ex rel. McCollum v. Board of Education, 333 U.S. 203, 206, 68 S.Ct. 461, 92 L.Ed. 649 (1948); Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175, 178–179, 189 (1969); Wright, Federal Courts § 13, at 42 n. 19 (2d ed. 1970).

## II.

■ Turning to the merits of plaintiffs' claim, we hold that Section 3201(2), by invidiously discriminating against efforts to achieve racial balance, violates the equal protection clause of the Fourteenth Amendment.

A. Plaintiffs have made a good case for the applicability of the principle of Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1967). Examination of the "historical context,"

the "immediate objective," and the "ultimate effect" of Section 3201(2), see id. at 373, 87 S.Ct. at 1630, supports the proposition that the statute serves to continue segregation in the schools and thus "significantly encourage[s] and involve[s] the State" in racial discrimination. See id. at 381, 87 S.Ct. at 1634. See Keyes v. School District No. 1, Denver, Colo., 313 F.Supp. 61 (D.Colo.1970) where the court found that the repudiation of measures designed to foster racial balance served to extend and encourage a local trend towards segregation in the schools. Before the enactment of Section 3201(2), the Regents of the University of the State of New York were firmly committed to a policy of eradicating *de facto* segregation in New York's public schools,[11] and appointed education officials were actively engaged in directing plans to improve racial balance.[12] The Regents' efforts met with considerable local resistance. See, e. g., Balaban v. Rubin, 14 N.Y.2d 193, 250 N.Y.S.2d 281, 199 N.E.2d 375, cert. denied, 379 U.S. 881, 85 S.Ct. 148, 13 L.Ed.2d 87 (1964); Offermann v. Nitkowski, 248 F. Supp. 129 (W.D.N.Y.1965), aff'd, 378 F.2d 22 (2d Cir. 1967); Vetere v. Allen, 15 N.Y.2d 259, 258 N.Y.S.2d 77, 206 N.E. 2d 174, cert. denied, 382 U.S. 825, 86 S. Ct. 60, 15 L.Ed.2d 71 (1965) (Hempstead); Olson v. Board of Education, 250

9. The case defendants cite, Board of Education, etc. v. Allen, 32 A.D.2d 985, 301 N.Y.S.2d 764 (3d Dep't 1969), on remand, 60 Misc.2d 926, 304 N.Y.S.2d 410 (Sup.Ct.1969), is not authority to the contrary.

10. For instance, defendants argue that Section 3201(2) does not prohibit orders by the Commissioner of Education directing local school boards to eliminate *de facto* segregation, but merely reserves to local elected boards the choice of the best means for achieving racial balance. Such an interpretation of the statute is untenable, for it is clear that the Commissioner would be unable to enforce such orders under the statute, and their issuance would be an exercise in futility.

This argument also ignores the fact that the statute prohibits local *appointed* boards from pursuing any nonvoluntary

programs aimed at alleviating racial imbalance. Defendants, however, would avoid this problem by urging that the statute might be interpreted to apply only where the local board is elected, since *some* official must still have the authority to develop and implement plans for achieving racial balance at the local level. We reject this argument as frivolous, for we cannot believe the New York Legislature is so inept at stating its intentions.

11. See, e. g., Integration and the Schools, A Restatement of Policy by the Regents of the University of the State of New York (1969).

12. The history of these efforts by state and local officials is related in detail in Racial and Social Class Isolation in the Public Schools, A Report to the Board of Regents of the University of the State of New York, ch. 1 (1969).

F.Supp. 1000 (E.D.N.Y.1966), appeal dismissed, 367 F.2d 565 (2d Cir. 1966) (Malverne) ; Board of Education, etc. v. Allen, 32 A.D.2d 985, 301 N.Y.S.2d 764 (3d Dep't 1969) (Mt. Vernon). It is quite apparent from the legislative history of Section 3201(2) that it was designed to turn the tables in favor of those recalcitrant local groups. For instance, Senator Lent, who sponsored the legislation in the Senate, made the following statements during the legislative debates on Section 3201(2):

"The purpose of [Section 3201(2)] is to control the practice initiated by the Commissioner of Education in this State of assigning youngsters to public schools on the basis of race or color in order to achieve a certain racial balance or quota, with all of the waste, disruption, community upheaval and expense which generally accompany such a move.

\* \* \* \* \* \*

" \* \* \* [D]espite the mounting evidence of the failures of these [racial balancing] schemes, they have continued to be foisted upon unwilling communities by the Commissioner of Education. \* \* \*

\* \* \* \* \* \*

"Gentlemen, I think \* \* \* [this legislation is] \* \* \* absolutely necessary if this Legislature is ever going to put a halt to situations where a duly constituted elected board familiar with local conditions and sentiment is forced to implement a plan conceived in and mandated from Albany which, tragically, disrupts the stability and educational climate in the community. Perhaps none of your school districts have been zeroed in as yet but a number of you probably have one or two districts in your area somewhere on the Commissioner's list."

New York State Senate Debate on Assembly Bill No. A 214 of 1969, at 2454, 2459, and 2462-63.

13. Between 1967 and 1968 alone, the number of pupils in schools with a student population 89% or more non-white in-

The ultimate impact of Section 3201(2) is equally clear. Racial isolation in the public schools of the State of New York is increasing. See Racial and Social Class Isolation in the Public Schools, A Report to the Board of Regents of the University of the State of New York 8-11 (1969).[13] The problem is admittedly one generated in large part by local housing patterns and economic conditions. Yet affirmative efforts to reduce such segregation have been perceptively slowed by Section 3201(2). The following statements by the Commissioner of Education, in answer to interrogatories propounded, are indicative of the effect which the statute will ultimately have:

"In every school district where racial imbalance exists there has been opposition to correction of such condition. Since [Section 3201(2)] has deprived me of the power to order the correction of racial imbalance, only persuasion and financial assistance for implementation of proposals to correct racial imbalance have been possible. The City School Districts of the Cities of Mount Vernon and Newburgh have withdrawn applications for funds to be used for assisting in the elimination of racial imbalance. Other districts with racial imbalance problems have simply referred to [Section 3201(2)] as the will of the State and have refused to take further action to solve such problems."

"[Section 3201(2)] will not itself tend to reduce benefits already gained, but will interfere substantially with further improvement because it prevents the board of education from assigning pupils without the consent of their parents. Because some parents will not consent to reassignment of their children for the purpose of correcting racial imbalance, significant progress in reducing such racial isolation is impossible."

creased by 24 percent. Racial and Social Class Isolation in the Public Schools, supra at 103.

In sum, Section 3201(2) is destined to bring to an end New York's strong pro-integration policy.

B. We need not, however, rest decision on *Reitman*. In Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the Supreme Court said that it did not have to rely on Reitman since the law in issue involved an "explicitly racial classification." We believe that is precisely what is involved here.

In *Hunter*, the Court considered an amendment to the Akron city charter which prevented the city council from implementing any ordinance dealing with racial, religious, or ancestral discrimination in housing without the prior approval of a majority of the voters of Akron. The Court found that the amendment, by drawing "a distinction between those groups seeking the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends," made it "substantially more difficult" to secure enactment of fair housing legislation and thus placed "special burdens on racial minorities within the governmental process." Hunter v. Erickson, supra at 390–391, 89 S.Ct. at 560. The result, the Court found, was "an explicitly racial classification treating racial housing matters differently from other racial and housing matters." Id. at 389, 89 S.Ct. at 560. Finding no compelling justification for such discrimination, the Court held that the amendment constituted an invidious denial of equal protection.

The principle of *Hunter* is that the state creates an "explicitly racial classification" whenever it differentiates between the treatment of problems involving racial matters and that afforded other problems in the same area.[14]

This is the effect of Section 3201(2). The statute, by prohibiting the implementation of plans designed to alleviate racial imbalance in the schools except with the approval of a local elected board or upon parental consent, creates a single exception to the broad supervisory powers the state Commissioner of Education exercises over local public education. See Vetere v. Allen, 15 N.Y.2d 259, 258 N.Y.S.2d 77, 206 N.E.2d 174, cert. denied, 382 U.S. 825, 86 S.Ct. 60, 15

14. The force of this principle was foreshadowed in Mr. Justice White's separate opinion in Evans v. Newton, 382 U.S. 296, 306, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). In that case, the Court held that the mere appointment of private trustees to manage the racially segregated park created by testamentary disposition could not "disentangle" the park from the effects of state enforced segregation by the municipal regime previously controlling the park. Id. at 302, 86 S.Ct. at 490. Mr. Justice White, however, would have remanded the case for further proceedings on the ground that the new private trustees could not in any event give effect to the racial conditions of the trust establishing the park, since the trust was incurably tainted by discriminatory state legislation favoring trust restrictions based on racial discrimination over trust restrictions for any other purpose. See id. at 306, 86 S.Ct. at 492.

At least one commentator recognizes this principle as the true basis for the Court's decision in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1969):

"The rule which I would propose, then, as a basis for the *Reitman* decision, is that where a racial group is in a political duel with those who would explicitly discriminate against it as a racial group, and where the regulatory action the racial group wants is of full and undoubted federal constitutionality, the state may not place in the way of the racial minority's attaining its political goal any barriers which, within the state's political system taken as a whole, are especially difficult of surmounting, by comparison with those barriers that normally stand in the way of those who wish to use political processes to get what they want." Black, The Supreme Court 1966 Term —Foreword: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L.Rev. 69, 82 (1967).

L.Ed.2d 71 (1965).[15] With regard to all other matters affecting educational policy, the Commissioner has the authority to order local boards to act in accordance with state educational policies as formulated by the Board of Regents. Parties considering themselves aggrieved by local board actions may seek to have the Commissioner enforce those policies. See N.Y. Education Law §§ 207, 310 (McKinney 1969). Section 3201(2), however, singles out for different treatment all plans which have as their purpose the assignment of students in order to alleviate racial imbalance. The Commissioner and local appointed officials are prohibited from acting in these matters only where racial criteria are involved. The statute thus creates a clearly racial classification, treating educational matters involving racial criteria differently from other educational matters and making it more difficult to deal with racial imbalance in the public schools. We can conceive of no more compelling case for the application of the *Hunter* principle.

Defendants, however, argue that Section 3201(2) does not constitute impermissible state involvement in racial discrimination, since in the absence of *de jure* segregation, the state is under no obligation to take affirmative action to reduce *de facto* segregation in the public schools and thus does not discriminate when it leaves such matters to a local elected board, so long as freedom of choice is preserved. Compare Green v. County School Bd., 391 U.S. 430, 440–442, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) with Deal v. Cincinnati Bd. of Education, 369 F.2d 55 (6th Cir. 1966), cert.

denied, 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967), opinion on appeal after remand, 419 F.2d 1387 (6th Cir. 1969). But the argument that the state has not discriminated because it has no constitutional obligation to end *de facto* racial imbalance fails to meet the issue under Hunter v. Erickson. The statute places *burdens* on the implementation of educational policies designed to deal with race on the local level. Indeed it completely *prohibits* the implementation of such policies where the local board is not elected. The discrimination is clearly based on race alone, and the distinction created in the political process, based on racial considerations, operates in practice as a racial classification. See Note, Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1080 (1969).

Nor is there any compelling justification for the statutory classification. Racial classifications are "constitutionally suspect," Bolling v. Sharpe, 347 U.S. 497, 499, 74 S.Ct. 693, 98 L.Ed. 884 (1954), bear a "heavy burden of justification," Loving v. Virginia, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and will be upheld only where "necessary, and not merely rationally related, to the accomplishment of a permissible state policy." McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964). See Hunter v. Erickson, supra, 393 U.S. at 392, 89 S.Ct. 557.

Defendants contend that the sole purpose of the statute was to give local boards, directly responsible to the people, control over the methods for achieving racial balance. The statute's salutary

15. See N. Y. Education Law § 305 (McKinney 1969) which provides in part: "The commissioner of education is hereby charged with the following powers and duties:
1. He is the chief executive officer of the state system of education and of the board of regents. He shall enforce all general and special laws relating to the educational system of the state and execute all educational policies determined upon by the board of regents.

2. He shall have general supervision over all schools and institutions which are subject to the provisions of this chapter, or of any statute relating to education, and shall cause the same to be examined and inspected, and shall advise and guide the school officers of all districts and cities of the state in relation to their duties and the general management of the schools under their control."

objective, they urge, was to assure the community acceptance necessary for the effectuation of local school desegregation. To the extent, however, that the statute thus recognizes and accedes to local racial hostility, the existence of which has created in the past a serious obstacle to the elimination of *de facto* segregation, the purpose is clearly an impermissible one. See Buchanan v. Warley, 245 U.S. 60, 80–81, 38 S.Ct. 16, 62 L.Ed. 149 (1917); Taylor v. Louisiana, 370 U.S. 154, 82 S.Ct. 1188, 8 L.Ed.2d 395 (1962) (per curiam). In any event, defendants have failed to show that the purpose they impute to the statute could not be accomplished by alternative methods, not involving racial distinctions. See Hunter v. Erickson, supra, 393 U.S. at 392, 89 S.Ct. 557.

In the final analysis the statute fails in justification because it structures the internal governmental process in a manner not founded on neutral principles. See Hunter v. Erickson, supra at 393–394, 89 S.Ct. 557 (concurring opinion of Mr. Justice Harlan). The New York Legislature has acted to make it more difficult for racial minorities to achieve goals that are in their interest. The statute thus operates to disadvantage a minority, a racial minority, in the political process. There can be no sufficient justification supporting the necessity of such a course of action. As the Court said in Hunter v. Erickson, supra at 392–393, 89 S.Ct. at 561:

> "[I]nsisting that a State may distribute legislative power as it desires and that the people may retain for themselves the power over certain subjects may generally be true, but these principles furnish no justification for a legislative structure which otherwise would violate the Fourteenth Amendment. * * * Even though Akron might have proceeded by majority vote at town meeting on all its municipal legislation, it has instead chosen a more complex system. Having done so, the State may no more disadvantage any particular group by making it more difficult to enact legislation

in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size."

We hold that Section 3201(2) constitutes an explicit and invidious racial classification and denies equal protection of the law.

The statute is accordingly unconstitutional and its operation is permanently enjoined. A suitable order providing for injunctive relief in accordance with this opinion may be submitted on notice to defendants.

Plaintiffs' petition for an order awarding them counsel fees is denied.