JULIA SMITH GIBBONS, Circuit Judge,
dissenting.
Proposal 2 is not unconstitutional under either a political restructuring theory or under traditional equal protection analysis. I therefore respectfully dissent.
I.
Elementary principles of constitutional law tell us that plaintiffs’ challenge to Proposal 2 should have little to no chance of success. Plaintiffs argue that Michigan must retain its racial and other preference policies in higher education and that the state’s voters cannot make the contrary policy choice that factors like race and gender may not be taken into account in admissions. They make this argument in the face of the core equal protection principle of nondiscrimination — a principle con *494 sistent with the choice of the people of Michigan. They make the argument despite the absence of any precedent suggesting that states must employ racial preferences in university admissions. Essentially, the argument is one of constitutional protection for racial and gender preference — a concept at odds with the basic meaning of the Equal Protection Clause, as understood and explained through decades of jurisprudence.
Although it has convinced a majority of this court, plaintiffs’ argument must be understood for the marked departure it represents — for the first time, the presumptively invalid policy of racial and gender preference has been judicially entrenched as beyond the political process. In reaching its conclusion, the majority strays from analysis bounded by familiar principles of constitutional law and loses sight of the parameters within which we should operate in deciding this case. To be accurate in characterizing the majority’s approach, it relies on two Supreme Court cases, which it deems highly instructive. Yet, when examined carefully, these cases have no application here, and, in emphasizing them, the majority overlooks recent case law providing more relevant guidance.
II.
The political restructuring theory on which the majority relies does not invalidate Proposal 2. Racial preference policies in university admissions — presumptively invalid but permissible under limited circumstances and for a finite period of time — do not receive the same structural protections against statewide popular repeal as other laws that inure to the interest of minorities. To understand why this is the case, it is necessary to view the Hunter/Seattle doctrine in the context of the recent decisional law of race-based classification. See Grutter v. Bollinger, 589 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (“Context matters when reviewing race-based governmental action under the Equal Protection Clause.”).
In holding that student-body diversity is a compelling state interest that can justify the narrowly tailored use of race in university admissions policies, Grutter set forth three principles about race-based admissions policies that bear repeating here. First, Grutter reminded us that “ ‘[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race’ ” and that, as a consequence, “race-conscious admissions policies must be limited in time.” Grutter, 539 U.S. at 341, 342, 123 S.Ct. 2325 (quoting Palmore v. Sidoti, 466 U.S., 429, 432, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984)). This principle makes sense because all “racial classifications are presumptively invalid....” Nev. Dep’t of Human Res. v. Hibbs, 538 U.S. 721, 736, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003). Second, Grutter indicated that the decision to end race-conscious admissions policies is primarily one to be made by states and their public universities, not courts. See Grutter, 539 U.S at 342, 123 S.Ct. 2325 (noting that “sunset provisions ... and periodic reviews” could be used to determine the continuing necessity of racial preferences and noting with favor race-neutral alternatives already employed in several states). And third, while racially conscious admissions policies are permitted, they are not constitutionally required. Id. at 325, 123 S.Ct. 2325 (“[Sjtudent body diversity is a compelling state interest that can justify the use of race in university admissions.”) (emphasis added); see Coal. to Defend Affirmative Action v. Granholm, 473 F.3d 237, 249 (6th Cir.2006) (“Grutter never said, or even hinted, that *495 state universities must do what they narrowly may do.”).

A.

With these core principles in mind we examine the applicability of Hunter and Seattle to the passage of Proposal 2 in Michigan.. We begin with Hunter v. Erickson, 393 U.S. 385, 386-87, 390, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), in which Akron voters repealed a fair housing ordinance that banned discrimination in the sale or lease of real property and created a more burdensome process for minorities to seek such protection. 393 U.S. at 386-87, 390, 89 S.Ct. 557. The underlying law — the repeal of which was effected through section 137 of the City Charter and was found to violate the political restructuring doctrine — protected minorities by mandating their equal right to be free from discrimination. Id. at 390-93, 89 S.Ct. 557. Hunter thus involved the repeal of a presumptively valid law that mandated equal treatment; it did not involve the repeal of a racial preference policy or any other law that was itself presumptively invalid. See Coral Constr., Inc. v. San Francisco, 50 Cal.4th 315, 113 Cal.Rptr.3d 279, 235 P.3d 947, 959 (2010) (“In no sense did [Hunter] concern preferences.... ”). Because Hunter considered only the political-process implications of repealing a law that required equal treatment, it cannot be read broadly to apply to the repeal of a law requiring preferential treatment. As we have observed, “[t]hese are fundamentally different concepts.” Granholm, 473 F.3d at 251; see Coal. for Econ. Equity v. Wilson, 122 F.3d 692, 708 (9th Cir.1997) (“It is one thing to say that individuals have equal protection rights against political obstructions to equal treatment; it is quite another to say that individuals have equal protection rights against political obstructions to preferential treatment.”). Thus, Hunter does not guide us here.
Nor does Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), suggest application of the political restructuring doctrine to Proposal 2. The underlying law in Seattle was a local ordinance that implemented a series of school desegregation measures, which was repealed by a statewide referendum called Initiative 350. Seattle, 458 U.S. at 460-62, 102 S.Ct. 3187. In finding that the passage of Initiative 350 violated the political structure doctrine, Seattle explained that “when the political process or the decisionmaking mechanism used to address racially conscious legislation — and only such legislation — is singled out for peculiar and disadvantageous treatment, the governmental action plainly rests on distinctions based on race.” 458 U.S. at 485, 102 S.Ct. 3187 (second emphasis supplied) (internal quotation marks omitted); see also id. at 474, 102 S.Ct. 3187 (“The initiative removes the authority to address a racial problem — and only a racial problem — from the existing decisionmaking body....” (emphasis supplied)). In other words, in order to trigger political-process concerns, Seattle instructs that the challenged enactment must single out racial issues or racially oriented legislation. And indeed, the challenged enactment in Seattle, though facially neutral, was “carefully tailored to interfere only with desegregative busing” — that is, to address “only a racial problem.” Id. at 471 & n. 14, 474, 102 S.Ct. 3187. That is not the case here. Proposal 2 does not address “only a racial problem:” it prohibits any preference on the basis of race, sex, color, ethnicity, or national origin. Mich. Const, art. I. § 26. Nor was Proposal 2 “carefully tailored” to affect only university admissions: it extends not just to public universities but also to public employment and public contracting. Id. Accordingly, Proposal 2 is quite unlike the narrow anti-busing meas *496 ure struck down in Seattle; it represents “a sea change in state policy, of a kind not present in Seattle or any other ‘political structure’ case.” See Coral Constr., 113 Cal.Rptr.3d 279, 235 P.3d at 966 (Corrigan, J., concurring).
The majority is quick to conclude that Proposal 2 and Initiative 350 each target policies — affirmative action and integrative busing, respectively — that “inuref ] primarily to the benefit of the minority” and therefore each has a “racial focus.” (Maj. Op. at 477-79.) But in a political-restructuring challenge, it is not enough to observe that some of the policies affected by the challenged enactment primarily benefit minorities. Nor is it enough to observe that, as here, the challenged enactment was passed in response to a high-profile case permitting racially conscious admissions policies under some circumstances. Though relevant, these observations are alone insufficient: in a political restructuring case, it is imperative to consider the scope of the challenged enactment itself.[1] The majority fails to account for the broad substantive reach of Proposal 2 when compared to the narrow focus of Initiative 350 and, in so doing, improperly stretches the political restructuring doctrine that Seattle articulates to the instant case.
There is an additional reason that the political restructuring doctrine should not apply here, a reason that has less to do with Seattle itself than with the evolution of equal protection jurisprudence since it was decided. Today, it is plain that a racially conscious student assignment system — such as the one that the Seattle initiative attempted to make more difficult to enact — would be presumptively invalid and subject to strict scrutiny. See Parents Involved in Cmty. Sch. v. Seattle Schs. Dist. No. 1, 551 U.S. 701, 720, 127 S.Ct. 2738, 168 L.Ed.2d 508 (2007) (“[T]he school districts must demonstrate that the use of individual racial classifications in the assignment plans here under review is narrowly tailored to achieve a compelling government interest.” (internal quotation marks omitted)). But that was not always the case. As the California Supreme Court has observed, “at the time Seattle was decided, the high court’s prior decisions indicated that the assignment of pupils by ratios to achieve racial balance fell ‘within the broad discretionary powers of school authorities’ to formulate ‘educational policy’ and to ‘prepare students to live in a pluralistic society....’” Coral Constr., 113 Cal.Rptr.3d 279, 235 P.3d at 959 (quoting Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)); see N.C. State Bd. of Educ. v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971) (“[Sjchool authorities have wide discretion in formulating school policy, and that as a matter of educational policy school authorities may well conclude that some kind of racial balance in the schools is desirable quite apart from any constitutional requirements.”); see Deborah N. Archer, Moving Beyond Strict Scmtiny: The Need for A More Nuanced Standard of Equal Protection Analysis for K Through 12 Integration Programs, 9 U. Pa. J. Const. L. 629, 648 & n.118 (2007) (writing, prior to Parents Involved, that “strict scrutiny has never been applied in the context of school desegrega *497 tion by the Supreme Court”); cf. Parents Involved, 551 U.S. at 737, 127 S.Ct. 2738 (plurality) (“[W]hen Swann was decided, this Court had not yet confirmed that strict scrutiny applies to racial classifications like those before us [ie., a racially conscious student assignment program].”). Indeed, it was not until 1995 that the Supreme Court made clear in Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 227, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), that strict scrutiny applies to all racial classifications. See Parents Involved, 551 U.S. at 720, 127 S.Ct. 2738 (majority opinion) (citing Adarand); id. at 739 n. 16, 127 S.Ct. 2738 (plurality opinion) (citing Adarand); id. at 758, 127 S.Ct. 2738 (Thomas, J., concurring) (citing Ada-rand); Jonathan Fischbach et al., Race at the Pivot Point: The Future of Race-Based Policies to Remedy De Jure Segregation After Parents Involved in Community Schools, 43 Harv. C.R.-C.L. L. Rev. 491, 529-30 (2008) (“Adarand ... established the uniform application of strict scrutiny to all racial classifications.”); Jed Rubenfeld, The Anti-Antidiscrimination Agenda, 111 Yale L.J. 1141, 1168 (2002).
Thus, when articulating the reach of the political restructuring doctrine, Seattle did not consider that the underlying policy affected by the challenged enactment was presumptively invalid.[2] But we must consider that fact here. And indeed, the circumstance that racially conscious admissions policies are subject to the most exacting judicial scrutiny and limited in time — legal realities that the Seattle Court neither confronted nor factored into its decision — counsels heavily against applying the political restructuring doctrine to the enactment of Proposal 2. See Grutter, 539 U.S. at 341-42, 123 S.Ct. 2325. GruttePs charge that “[u]niversities in other States can and should draw on the most promising aspects of ... race-neutral alternatives as they develop” only underscores this point. Id. at 342, 123 S.Ct. 2325. So while the majority is correct that Seattle employs broad language about protecting the “ ‘ability of minority groups to achieve beneficial legislation’ ” (Maj. Op. at 488 (quoting Seattle, 458 U.S. at 467, 102 S.Ct. 3187)), it must be remembered that the “beneficial” policy that Proposal 2 purportedly makes more difficult to enact is itself “‘highly suspect.’ ”[3] Grutter, 539 U.S. at 326, 123 S.Ct. 2325 (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 493, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989)). This is exactly the type of “[c]ontext [that] matters when reviewing race-based governmental action under the Equal Protection Clause.” Id. at 327, 123 S.Ct. 2325. In short, equal protection jurisprudence regarding the use of racial classifications has developed markedly since Seattle was *498 decided, and this development makes clear that applying the political restructuring doctrine to the enactment of Proposal 2 is hardly appropriate.
B.
In concluding that a race-based classification that is presumptively invalid, but permissible under limited circumstances and for a finite period of time, receives the same structural protections against statewide popular repeal as other laws that inure to the interest of minorities, the majority walks alone. The two highest courts to have considered the question have concluded that the political restructuring doctrine of Hunter and Seattle does not prevent the statewide popular elimination of race-based classification policies. The Ninth Circuit concluded that California’s Proposition 209, which eliminated public race-based and gender-based affirmative action programs, did not violate equal protection because “[i]mpediments to preferential treatment do not deny equal protection.” Wilson, 122 F.3d at 708. The court relied on an essential constitutional principle: “While the Constitution protects against obstructions to equal treatment, it erects obstructions to preferential treatment by its own terms.... The Equal Protection Clause, parked at our most ‘distant and remote’ level of government, singles out racial preferences for severe political burdens — it prohibits them in all but the most compelling circumstances.” Id. The Ninth Circuit recently affirmed its commitment to the reasoning in Wilson, finding it “easily reconciled” with Grutter. Coal. to Defend Affirmative Action v. Brown, 674 F.3d 1128, 1136 (9th Cir.2012). The California Supreme Court came to the same conclusion, quoting Grutter for the principle that “ ‘racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands. Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle.’ ” Coral Constr., 113 Cal.Rptr.3d 279, 235 P.3d at 960 (quoting Grutter, 539 U.S. at 342, 123 S.Ct. 2325). The court explained that “[ijnstead of burdening the right to equal treatment, [the statewide referendum banning race-based classification] directly serves the principle that ‘all governmental use of race must have a logical end point.’ ” Id. (quoting Grutter, 539 U.S. at 342, 123 S.Ct. 2325). Our own district court agreed: “Proposal 2 does not offend the Equal Protection Clause by distancing racial minority groups from the means of obtaining equal protection.” Coal. to Defend Affirmative Action v. Regents of Univ. of Mich., 539 F.Supp.2d 924, 957 (E.D.Mich.2008).
The teaching of these cases is that equal treatment is the baseline rule embodied in the Equal Protection Clause, from which racial-preference programs are a departure. See Grutter, 539 U.S. at 342, 123 S.Ct. 2325 (“[R]aee-conscious admissions programs ... [are a] deviation from the norm of equal treatment of all racial and ethnic groups.... ”). These programs— fundamentally different from the underlying policies in Hunter and Seattle — cannot receive special sanctuary from a decision of the majority of voters to return their law to the equal protection norm of equal treatment.
III.
There is another reason that Hunter and Seattle cannot forbid the amendment of the Michigan Constitution through the passage of Proposal 2. In both cases the relevant lawmaking authority was reallocated from a local legislative body to the “more complex government structure,” id. at 477, 102 S.Ct. 3187, of the city- or state *499 wide general electorate, thereby placing a “comparative structural burden ... on the political achievement of minority interests,” id. at 475 n. 17, 102 S.Ct. 3187. A key consideration in analyzing a Hunter political structure challenge, therefore, is whether the challenged law affects the ability of minorities to secure “legislation that is in their interest” as minorities. Id. at 474, 89 S.Ct. 557 (internal quotation marks omitted); see also id. at 475 n. 17, 89 S.Ct. 557 (“Thus, in Hunter, the procedures for enacting racial legislation were modified in a such a way as to place effective control in the hands of the citywide electorate. Similarly here [in Seattle], the power to enact racial legislation has been reallocated.”). As the record here demonstrates, the people of Michigan have not restructured the state’s lawmaking process in the manner prohibited by Hunter and Seattle. Instead, their vote removed admissions policy from the hands of decision-makers who were unelected and unaccountable to either minority or majority interests and placed it squarely in an electoral process in which all voters, both minority and majority, have a voice.
A.
Public higher education in Michigan is unique in that “[t]he Michigan Constitution confers a unique constitutional status on [Michigan’s] public universities and their governing boards.” Federated Publ’ns, Inc. v. Bd. of Trs. of Mich. State Univ., 460 Mich. 75, 594 N.W.2d 491, 495-96 (1999) (citing Mich. Const, art. VIII, §§ 5 and 6). These boards are “the highest form of juristic person known to the law, a constitutional corporation of independent authority, which, within the scope of its functions, is coordinate with and equal to that of the legislature.” Id. at 496 n. 8, 594 N.W.2d 491 (quoting Bd. of Regents of the Univ. of Mich. v. Auditor Gen., 167 Mich. 444, 132 N.W. 1037, 1040 (1911)). Each governing board is vested with the power of “general supervision of its institution and the control and direction of all expenditures from the institution’s funds.” Mich. Const, art. VIII, § 5. The constitution provides for eight-member governing boards, elected to statewide office for eight-year terms, Mich. Const, art. VIII, § 5, and elections are typically staggered, with, for example, an election every two years for regents of the University of Michigan.
Although these universities and their respective boards are created by the Michigan Constitution, the admissions policies are placed within the control of the boards or school authorities only within each board’s bylaws. Thus, the admissions policies are not established by the state constitution, and it is necessary to look to testimony to determine where the power to set admissions policy lies.
The governing boards have fully delegated the responsibility for establishing admissions standards to several program-specific administrative units within each institution, which set admissions criteria through informal processes that can include a faculty vote. For example, at the University of Michigan Law School the admissions policy is set by the law school faculty admissions committee, with major substantive changes occasionally voted upon by the entire law school faculty. Similarly, as described by its former dean, at the Wayne State University Law School the ultimate decision whether to change admissions standards rests with the faculty alone. Thus, as the Cantrell Plaintiffs readily admitted in their previous briefing, the “faculty are the primary architects of all the admissions criteria and protocols.”
As the deans of both law schools explained, at neither university is there a system in place to review or alter admis *500 sions policies at a level above a vote of the faculty. Sarah Zearfoss, the dean of admissions at the University of Michigan Law School, testified that no one could change the school’s admissions policy other than the faculty admissions committee or the faculty itself, because “there’s no higher body” to which someone unhappy with an admissions policy could advocate change. And Frank Wu, then the dean at Wayne State University Law School, agreed that “only the faculty at the law school has the authority to create and approve the admissions policy” at the school. Indeed, Wu testified that the admissions policy is not subject to the approval of the Wayne State University Board of Governors, and, in his view, if the Board of Governors attempted to alter the decision of the law school’s faculty with respect to criteria for admission, “it would precipitate a constitutional crisis.” Each institution’s board may superficially have “plenary authority” over its respective institution (see Maj. Op. at 480), but the real authority to set admissions policy rests with each program-specific faculty within the universities.
The majority ignores the factual testimony of Deans Zearfoss and Wu, which explains how admissions policies are actually crafted. Instead, the majority emphasizes that the boards — although they have fully delegated their decisionmaking power to admissions directors and faculty — can revoke this authority and can revise any bylaw in order to effect changes in university admission policies. That the boards can legally revoke a delegation of authority or have occasionally revised their bylaws to effect a change in admissions policy, however, does not change the underlying factual reality that the law school deans describe. Their testimony demonstrates that program-specific faculties do not merely manage the “day-to-day implementation of policy,” (Maj. Op. at 482); these entities also set and change admissions policies — without any significant oversight by the boards.
B.
The decisionmaking structure at the universities is important because these program-specific faculty admissions committees are far afield from the legislative bodies from which lawmaking authority was removed in Hunter and Seattle. To appreciate this critical difference, we need look no further than Seattle itself.
In Seattle, the Court emphasized that the type of action it found objectionable was the creation of comparative burdens “on minority participation in the political process.” 458 U.S. at 480 n. 23, 102 S.Ct. 3187; see id. at 486, 102 S.Ct. 3187 (“[Minorities are no less powerless with the vote than without it when a racial criterion is used to assign governmental power in such a way as to exclude particular racial groups ‘from effective participation in the political proces[s].’ ” (quoting City of Mobile v. Bolden, 446 U.S. 55, 94, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) (White, J., dissenting))). The Seattle majority, however, did not view state university admissions committees as a part of the “political process” in the manner of an elected school board or city council. A dialogue between the majority and dissent in Seattle is particularly instructive on this point. In dissent, Justice Powell, critiquing the potential breadth of the majority’s holding, argued:
Thus, if the admissions committee of a state law school developed an affirmative-action plan that came under fire, the Court apparently would find it unconstitutional for any higher authority to intervene unless that authority traditionally dictated admissions policies. As a constitutional matter, the dean of the *501 law school, the faculty of the university system as a whole, the university president, the chancellor of the university, and the board of regents might be powerless to intervene despite their greater authority under state law.
Id. at 498 n. 14, 102 S.Ct. 3187 (Powell, J., dissenting). The majority, however, flatly dismissed this concern as a misunderstanding of the court’s decision: “It is evident, then, that the horribles paraded by the dissent, post, at [footnote 14 of the dissent] — which have nothing to do with the ability of minorities to participate in the process of self-government — are entirely unrelated to this case.” Id. at 480 n. 23, 102 S.Ct. 3187 (emphasis added).
For the Seattle majority, then, an impermissible reordering of the political process meant a reordering of the processes through which the people exercise their right to govern themselves. See id. at 486, 102 S.Ct. 3187 (“And when the State’s allocation of power places unusual burdens on the ability of racial groups to enact legislation specifically designed to overcome the ‘special condition’ of prejudice, the governmental action seriously ‘curtails] the operation of those political processes ordinarily to be relied upon to protect minorities’ ... from the ‘majoritarian political process.’ ” (emphasis added) (quoting United States v. Carolene Prods. Co. 304 U.S. 144, 153 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938); San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 28, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973))); see id. at 467, 93 S.Ct. 1278 (“But the Fourteenth Amendment also reaches a “ ‘political structure that treats all individuals as equals’ ... yet more subtly distorts governmental processes in such a way as to place special burdens on the ability of minority groups to achieve beneficial legislation.” (emphasis added) (quoting Bolden, 446 U.S. at 84, 100 S.Ct. 1490)).
Thus, the academic processes at work in state university admissions in Michigan are not “political processes” in the manner contemplated in Seattle. Unlike the Seattle School Board and the Akron City Council, the various Michigan university admissions committees and faculty members are unelected. As at most public universities, tenured faculty members have significant vested rights associated with their employment in order to preserve academic freedom and independence. The faculty members who are permitted to vote on policy matters are therefore significantly insulated from political pressure by virtue of their tenure. These faculty are beholden to no constituency — student, local, or otherwise. And, as demonstrated by the testimony of the law school deans in this case, the people of Michigan have no ability to exert electoral pressure on the university decision makers to change their admissions polices. As they currently stand, the faculty admissions committees are islands unto themselves, vested with the full authority to set admissions policy for their respective university programs.
Of course, when an elected body delegates a power, it does not automatically follow that the delegatee’s decisions fall outside the political process. But that is not the point. Rather, the testimony of the law school deans demonstrates that, whatever the formal legal structure, the faculty committees set admissions policies without significant review by the boards— thus insulating them from the political pressures the boards themselves face.[4]
*502 Furthermore, there is no “local” university constituency as there is a local constituency for a city council or city school board, i.e., the city’s voters. Rather, despite there being a broad student, faculty, and staff community associated with each university, Michigan’s state universities were established as state-wide institutions with a state-wide constituency. The faculty admissions committees therefore do not “represent” any local constituency at all. This is particularly important because the Seattle majority looked closely at the fact that Washington’s lodging of political decisionmaking authority over the busing question at the statewide level directly burdened minority interests by “mak[ing] the enactment of racially beneficial legislation difficult, [because] the particular program might not have inspired opposition had it been promulgated through the usual [local] legislative processes used for comparable legislation.” 458 U.S. at 483-84, 102 S.Ct. 3187. The Court continued:
That phenomenon is graphically demonstrated by the circumstances of this litigation. The longstanding desegregation programs in Pasco and Tacoma, as well as the Seattle middle school integration plan, have functioned for years without creating undue controversy. Yet they have been swept away, along with the Seattle Plan, by Initiative 350. As a practical matter, it seems most unlikely that proponents of desegregative busing in smaller communities such as Tacoma or Pasco will be able to obtain the statewide support now needed to permit them to desegregate the schools in their communities.
Id. at 484 n. 27, 102 S.Ct. 3187. The availability of “local” decisionmaking is therefore important when the political power of groups who could succeed at the local level is diluted in the statewide decisionmaking process. The universities here, however, are statewide institutions with a statewide constituency. There is nothing local about them.
Nor are the committees particularly accessible or subject to effective lobbying. While members of the public may attend faculty meetings at which admissions standards are reviewed, there is no formal mechanism by which a member of the public — student or not — can move the committees to amend the admissions standards. And while interested students and members of the public are, with advance notice, permitted to speak at faculty meetings to comment on the admissions policies, the committees are not required to consider these comments seriously, issue written findings addressing these concerns, or do more than provide a forum for interested individuals to speak. Rather, it appears that the main source of divergent views on admissions policies is the faculty members themselves.
*503 The lack of a viable electoral mechanism to change university admissions policies at a sub-constitutional level means that the voters’ use of a constitutional amendment in this instance does not serve to create “comparative structural burden[s] ... on the political achievement of minority interests.” Seattle, 458 U.S. at 474 n. 17, 102 S.Ct. 3187. If, as the evidence before this court makes plain, the voters cannot exert electoral pressure on independent faculty committees, then all voters regardless of racial identity compete on the same level for the political achievement of their higher-education interests: the constitutional level. This state constitutional amendment does not, then, create an improper comparative structural burden, but rather merely requires proponents of the use of racial preferences in admissions policy to engage the same level of process followed by proponents of Proposal 2. Thus, contrary to what the majority suggests, the burden upon a citizen who advocates for legacy preferences in university admissions is similar to the burden upon a citizen who advocates for racial preferences. Although the former may attempt to lobby a faculty committee or university directly, these entities — according to the clear testimony of the law school deans and the manner in which authority has been delegated — will likely be unresponsive. Likewise, efforts to elect a particular board member, where the evidence demonstrates that the boards do not alter the admissions policies approved by the faculty committees, will similarly have little effect on admission policies.
Although the majority appears to see no reason to distinguish between the unelected and unresponsive program-specific faculty admissions committees here and the legislative bodies from which lawmaking authority was removed in Hunter and Seattle, a consideration of political accountability in the political process is squarely grounded in the Seattle opinion. In Seattle, the Court undertook a close examination of Washington’s system of “establishing] the local school board, rather than the State, as the entity charged with making decisions of the type at issue,” 458 U.S. at 477, 102 S.Ct. 3187:
But Washington has chosen to meet its educational responsibilities primarily through “state and local officials, boards, and committees,” and the responsibility to devise and tailor educational programs to suit local needs has emphatically been vested in the local school boards.
Thus “each common school district board of directors” is made “accountable for the proper operation of its district to the local community and its electorate.” To this end, each school board is “vested with the final responsibility for the setting of policies ensuring quality in the content and the extent of its educational program.”
Id. at 477-78, 102 S.Ct. 3187 (citations omitted) (emphases added); see also id. (noting the “disclosure and reporting provisions specifically designed to ensure the board’s ‘accountability’ to the people of the community ” (emphasis added)). It was only upon its consideration of the state statutory structure’s vesting of decision-making in local and politically accountable school boards that the Court could conclude that “placing power over desegregative busing at the state level ... restructured the Washington political process.” Id. at 480, 102 S.Ct. 3187. Taking this into account, it is difficult to conclude that, in amending their state constitution to prohibit the use of racial preferences in university admissions, the people of Michigan modified “the community’s political mechanisms ... to place effective decisionmaking authority over a racial issue at another level of government.” Id. at 474, 102 S.Ct. *504 3187 (emphases added). Michigan has not “ ‘burden[ed] all future attempts’ to implement race-conscious admissions policies ‘by lodging decisionmaking authority over the question at a new and remote level of government.’ ” (Maj. Op. at 487 (quoting Seattle, 458 U.S. at 483, 102 S.Ct. 3187).) Having little or no direct or indirect influence on the bodies that actually set admissions standards — the faculty committees— the people of Michigan made a political change at the only level of government actually available to them as voters. The Michigan electorate, therefore, as opposed to choosing a more complex structure for lawmaking, employed the one effective method available to exert electoral pressure on the mechanisms of government.
In short, Michigan has chosen to structure its university system such that politics plays no part in university admissions at all levels within its constitutionally created universities. The Michigan voters have therefore not restructured the political process in their state by amending their state constitution; they have merely employed it.
IV.
Finally, it is plain that Proposal 2 does not violate the Equal Protection Clause under a traditional approach to equal protection. “The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race.” Washington v. Davis, 426 U.S. 229, 239, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). We apply strict scrutiny to laws that (1) include a facial racial classification or (2) have a discriminatory impact and a discriminatory purpose. Adarand, 515 U.S. at 227, 115 S.Ct. 2097; Davis, 426 U.S. at 239-42, 96 S.Ct. 2040. Proposal 2, which prohibits racial classifications, a fortiori does not classify facially on the basis of race. See Wilson, 122 F.3d at 702; Coral Constr., 113 Cal.Rptr.3d 279, 235 P.3d at 957. As to discriminatory impact and purpose, the district court did find “sufficient evidence to establish a fact question on the disparate impact part of the test” but found no discriminatory purpose. Coal. to Defend Affirmative Action, 539 F.Supp.2d at 951-52. Indeed, it stated that “the demonstration of a discriminatory purpose ... dooms [the] conventional equal protection argument” because it “cannot [be] sa[id] that the only purpose of Proposal 2 is to discriminate against minorities.” Id. (citing various motivations of Proposal 2’s chief supporters that were not racially discriminatory). The district court’s conclusions are correct. “[A]bsent a referendum that facially discriminates racially, or one where although facially neutral, the only possible rationale is racially motivated, a district court cannot inquire into the electorate’s motivations in an equal protection clause context.” Arthur v. Toledo, 782 F.2d 565, 574 (6th Cir.1986). Thus, no heightened level of scrutiny need be applied to Proposal 2, and under rational basis review, Proposal 2 is easily justifiable. Proposal 2 does not violate the Equal Protection Clause under the conventional analysis. See Brown, 674 F.3d at 1135; Wilson, 122 F.3d at 701; Coral Constr., 113 Cal.Rptr.3d 279, 235 P.3d at 957.
V.
As a last matter, I have no disagreement with the majority’s treatment of the procedural issues discussed in Part II.B and C.
VI.
For these reasons, I would conclude that Proposal 2 does not violate the Equal Protection Clause of the United States Constitution under either a political restructuring theory or traditional theory of equal pro *505 tection. Accordingly, I would affirm the judgment of the district court.

. It is true that Hunter involved a challenged enactment that thwarted the passage of local ordinances focusing not only on racial but also on religious and ancestral discrimination. Hunter, 393 U.S. at 386, 89 S.Ct. 557. But Hunter’s section 137 was far narrower than Proposal 2 in that it did not extend to sex nor did it apply beyond housing matters. Furthermore, as explained above, Hunter did not even arguably involve the repeal of a law instituting racial preferences and thus does not suggest application of the political restructuring doctrine here.

. While the dissent in Seattle suggested that the busing program be subject to strict scrutiny, 458 U.S. at 492 n. 6, 102 S.Ct. 3187 (Powell, J., dissenting), the majority did "not specifically pass on that issue” because no one had challenged "the propriety of race-conscious student assignments for the purpose of achieving integration, even absent a finding of prior de jure segregation.” Id. at 472 n. 15, 102 S.Ct. 3187 (majority opinion); see also Parents Involved, 551 U.S. at 721 n. 10, 127 S.Ct. 2738 (noting that in Seattle the question of "whether a district's voluntary adoption of race-based assignments in the absence of a finding of prior de jure segregation was constitutionally permissible” was "an issue ... expressly reserved”).

. For this reason, it is unimportant whether at the challenged enactment in Seattle imposed "an obstacle impeding preferential treatment” (Maj. Op. at 486) or whether the enactment merely made it more difficult to seek protection from discrimination. Whatever the case, Seattle did not involve the rights of minorities to a policy that was presumptively invalid and explicitly limited in time.

. Lee v. Nyquist, 318 F.Supp. 710 (W.D.N.Y.1970), aff'd Nyquist v. Lee, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 (1971), a case from the Western District of New York that was summarily affirmed by the Supreme Court and cited in Seattle, is not to the contrary. In Nyquist, the court found that a New York statute that "prohibit[ed] state education *502 officials and appointed school boards from assigning students, or establishing, reorganizing or maintaining school districts, school zones or attendance units for the purpose of achieving racial equality in attendance” unconstitutionally reordered the political process in violation of the Equal Protection Clause. Nyquist, 318 F.Supp. at 712, 720. The fact that appointed school boards were part of the political process at issue in Nyquist does not mean that the university faculty admissions committees are similarly part of the political process. The decision in Nyquist made note of how the local boards were accountable to the community: "Parties considering themselves aggrieved by local board actions may seek to have the Commissioner enforce those policies. [The New York statute], however, singles out for different treatment all plans which have as their purpose the assignment of students in order to alleviate racial imbalance.” Id. at 719 (internal citations omitted). Thus, even the appointed school boards were accountable to the community in a way in which the faculty admissions committees certainly are not.